TORRUELLA, Circuit Judge,
opinion of the court except as to Part II.B, Part II.C.l, and Part II.C.2; Dissenting in Part II.B, Part II.C.1, and Part II.C.2.[1]
“Quis custodiet ipsos custodes?”[2]
We are presented with highly troubling instances of abuses of police power, including the disturbing practice, conducted by certain members of the Mayagüez Drugs and Narcotics Division of the Puerto Rico Police Department, of planting evidence and conducting illegal searches and seizures in violation of the Fourth Amendment.
Defendants-Appellants Pascual Santiago-Méndez (“Santiago”), Anthony Domínguez-Colón (“Domínguez”), Victor Cortés-Caban (“Cortés”), and Luis Enrique Ruperto-Torres (“Ruperto”), all police officers in the Puerto Rico Police Department, were charged in a two-count indictment for (1) conspiring to injure, oppress, threaten, and intimidate persons in the town of Mayagüez in the free exercise or enjoyment of their constitutional rights in violation of 18 U.S.C. § 241, and (2) conspiring to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) & 846.[3] Following their jury trial, all appellants were convicted of count one, with Santiago, Cortés, and Dominguez also being convicted of count two.
All appellants challenge their convictions, asserting that the government failed *6 to present sufficient evidence showing a violation of either 18 U.S.C. § 241 or 21 U.S.C. §§ 841(a)(1) & 846.[4] Additionally, Santiago, Domínguez, and Ruperto raise distinct challenges to their sentences.
In brief, we affirm all appellants’ convictions as to count one. As to the convictions under count two for alleged conspiracy to possess with intent to distribute controlled substances, we are presented with a matter of first impression. And it is here that I part company with my colleagues, who affirm the convictions of Santiago, Cortés, and Dominguez as to count two and conclude that the government’s evidence satisfies the legal requisites for a conviction of conspiracy to possess with intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846. I respectfully dissent from my colleagues’ holding in this respect for the reasons set forth infra.
The evidence supporting the convictions as to both count one (conspiracy to violate civil rights) and count two (conspiracy to possess controlled substances with intent to distribute) is substantially the same and is sufficient to permit the jury to conclude beyond a reasonable doubt the following facts.
I. The Facts
A. The Black Box and the Nefarious Use of its Contents by Certain Police Officers
The underlying criminal acts at issue in this case may be traced back — like so many Pandora-released evils — to a box.
Appellants, members of the Puerto Rico Police Department’s Mayagüez Drugs and Narcotics Division (the “Division”), were convicted of fabricating criminal cases against citizens through the planting of controlled substances, leading to such citizens’ wrongful arrests based on the fabricated evidence. Several appellants asserted that this was done to meet a department-required weekly quota of arrests.[5]
From 2005 to 2007, Lieutenant Dennis Muñiz (“Muñiz”) served as the director of the Division. He participated and assisted in overseeing this fabrication practice. At trial, Muñiz, testifying as a government witness, stated that the drugs used by the officers for purposes of fabrication typically were stored in a metal black box that generally was under the care and custody of Santiago, a supervisor in the Division. It was Santiago’s practice to store the box in a file cabinet in his office. The box contained a mélange of contraband, including crack, cocaine, heroin, aluminum strips, drug paraphernalia, and ammunition rounds. Such contraband was given to agents prior to their execution of a search warrant or other intervention to ensure that an arrest would ensue. Testimony at trial confirmed that Muñiz and Santiago specifically instructed officers to plant drugs if a search or intervention was not “positive,” i.e., did not produce valid *7 grounds for arrest.[6]
The following acts of fabrication were established beyond a reasonable doubt.[7]
1.The Stolen Car Incident
Muñiz testified that sometime during his tenure as director of the Division, his daughter called him to report that her car had been stolen. Muñiz stated that he immediately contacted Santiago to help investigate the matter and locate the vehicle while he drove to meet his daughter. Meanwhile, Santiago recruited agents Luis Vélez (“Vélez”) and Domínguez to assist. Soon after, Santiago called Muñiz to inform him that they not only had located his daughter’s car, but also had arrested three minors whom they were taking to the Division in Mayagüez. Muñiz quickly altered his course to drive to the Division, confirm ownership of the vehicle, and observe the detained youths. On arriving at the Division, Muñiz recognized his daughter’s car. When he spoke with Santiago, Santiago informed him that he had fabricated a case against the minors, charging them with possession of controlled substances even though no drugs had been found on them at the time of arrest or processing. The arrested minors were processed for possession of controlled substances and robbery of the vehicle, ultimately pleading guilty to both counts. Of course, only the car robbery charge was properly supported by legal evidence.
2. The Search of “El Monstruo’s” Home
Around the end of 2006 and early 2007, officers conducted a search of the residence of José “El Monstruo.”[8] Before leaving the Division to assist with the search, Santiago handed Agent Vélez a small bag containing marijuana and cocaine. Santiago, speaking on behalf of himself and Muñiz, instructed Vélez to “wait for their call” before taking any action, and advised Vélez that the search had to be “positive.” Vélez, also testifying for the government, indicated that he only abided by the second part of the instruction, taking it upon himself to plant the drugs in a closet next to the bathroom upon entering the premises without waiting for Santiago or Muñiz’s go-ahead. Vélez also testified that he received numerous calls from both Santiago and Muñiz during the search, in which they repeatedly stressed that the search had to be “positive.” During one such call, Vélez stated that he told them “the job had been done” and to “take it easy.” Two individuals present at the residence were arrested as a result of the search and charged with illegal possession of controlled substances.
3. The Monte Isleño Search
In early 2007, Vélez was sent out to conduct another search and seizure operation, this time in the Monte Isleño housing project, the situs of an ongoing drug investigation with various search and seizure orders. Santiago again gave Vélez a bag of contraband, this time containing crack, *8 and instructed him to make sure the search turned out positive. On arriving at the premises, Vélez observed two detained individuals and proceeded to the interior of the residence; he planted the drugs in a bureau drawer located on the second floor and exited the home. Officers subsequently arrested the detained individuals based on the planted evidence.
4. The Man Who Swallowed Marijuana
Also in early 2007, agents Santiago, Vélez, and Dominguez were conducting a “preventive round” in an unmarked civilian vehicle in the area of Quinto Centenario under Muniz’s supervision.[9] While patrolling, the officers observed a group of people gathering under a tree. When the group spotted the police officers’ presence in the vehicle, one individual fled, which prompted Domínguez and Vélez to immediately exit the car and give chase. The chase was short-lived, as the individual tripped on his sandals and fell. The officers detained the individual and proceeded to search and question him. The search revealed no contraband on his person, but upon questioning by Vélez the suspect admitted to having swallowed marijuana before the police caught up to him. Vélez testified that he noticed the smell of marijuana on the man’s breath. The officers proceeded to arrest the subject and to take him to the police station for processing where he was charged with possession of cocaine, despite the fact that cocaine was not found in his possession.
5. The “Planting” at the Puchi Residence
In approximately February or March 2007, agents in the Division prepared for a search and seizure operation targeting a known drug leader’s home, Omayra Segarra, also known as “Puchi.” Vélez was to be one of the participating agents. Santiago, frustrated with Puchi’s lack of cooperation in providing the Division with information, decided to “fix” the search. Santiago, as had been done on previous occasions, advised Vélez that the search had to be “positive” and handed him several baggies containing marijuana and cocaine. Additionally, Santiago gave him specific instructions to plant the drugs in both Puchi’s home and in her car.
Various officers, including Cortés, traveled with Vélez to Puchi’s residence. Upon arrival, the officers, including Vélez, entered the residence. Vélez walked to a room and planted a bag containing cocaine on a shelf in the closet. He then exited the residence while the other officers continued the search of the home, eventually coming upon the planted evidence. While standing outside the residence, Vélez received a phone call from Santiago, who was en route to Puchi’s place, seeking an update on the Puchi search. Vélez informed him that the “job up in the residence was done,” but that “the one in [Puchi’s car] was still not so.”
Soon after, Santiago arrived and obtained the keys to Puchi’s vehicle from Agent Cortés, who was still inside the home conducting the search. Santiago opened Puchi’s car’s passenger door and instructed Vélez to plant the marijuana in the vehicle, which he did. Cortés then arrived with a drug canine, which quickly detected the planted marijuana. Puchi and her husband were arrested for possession of the planted controlled substances.
6.The Columbus Landing Episode
Following Puchi’s arrest, the agents returned to the Division. Some agents *9 worked on the processing of the Puehiresidence arrestees, while others left to get breakfast. The remaining agents, including Vélez, waited to execute other outstanding search and seizure orders. One of these orders included a search at the Columbus Landing housing project.
Vélez left the Division together with Santiago in a police vehicle, while other officers traveled to the project separately. Vélez testified that when he and Santiago arrived at the search location, Santiago handed him a brown paper bag containing baggies of cocaine. Santiago advised Vélez that the search had to be “positive.” Vélez testified that he felt “uncomfortable” with Santiago’s instructions, and told him that “this had to come to an end, that this manner of working could not continue.” Vélez then entered the home, placed the paper bag containing the cocaine baggies on top of a bureau in a bedroom, and exited the room.
On leaving the room, Vélez said he saw that the other assisting officers already had placed two of the home’s residents under arrest for legitimately-discovered— ie., not planted — controlled substances. Santiago, observing the same, instructed Vélez to retrieve the planted paper bag from the bedroom. Vélez complied and hid the bag inside his bulletproof vest pocket. Once Santiago and Vélez had reached their police vehicle, Vélez testified that he threw the drug bag into the private confines of the car and told Santiago, “This can’t go on. This isn’t going to happen again.” But like many other plans of mice and men, this was not to be.
Vélez participated in yet another search operation later that same day, also at the Columbus Landing housing project, planting the same bag retrieved from the previous operation in a pile of men’s shoes in the targeted residence, again pursuant to Muñiz’s instructions.' The planted evidence was again the basis for the arrest of the Columbus Landing resident.
7. Bosques’ Revenge
In July 2007, Santiago received a phone call from Agent José Bosques (“Bosques”), who by that time was cooperating with the Federal Bureau of Investigation (“FBI”).[10] Bosques told Santiago he needed drugs to fabricate a case against his neighbors, and told him he was going to the Division to obtain some from their stash. Santiago informed Bosques that he had left their cache with Vélez, but that he could take whatever he wanted. Bosques then called Vélez. Vélez was not at the office, but said the black box was. After speaking with Vélez, Bosques again contacted Santiago, informing him of his predicament. Santiago suggested that Bosques contact Agent Bey to see if he could provide him with the drugs, and Bosques did so. He explained to Bey why he wanted the drugs and requested a few bags of marijuana and cocaine. Bey initially told Bosques that he would look into it; however, when Bosques called Bey again while en route to the Division, Bey said he was no longer there, but that he had left the drugs with Dominguez.
When Bosques arrived, Dominguez had them go to the restroom. He then handed Bosques a clear plastic bag containing a small amount of the requested cocaine and marijuana. Upon seeing the small amount of drugs, Bosques asked Dominguez for rounds of ammunition that he could plant in addition to the drugs. Dominguez became suspicious of the request and asked *10 Bosques if he was “wired,” trying to lift up Bosques’s shirt to confirm his suspicions. Bosques literally dodged the question and moved out of Dominguez’s prying reach; he picked up his bulletproof vest, which was lying nearby, and held it against his body to avoid Dominguez’s inquisitive hands. Dominguez was taken in by this ruse and desisted in his attempt to pat Bosques down, instead giving Bosques the requested rounds. Bosques then left the premises, thereafter handing the drugs, ammunition, and recording equipment to the FBI.
8.Going to the Dogs
Also in July 2007, civilian Wilfredo Henriquez Pérez (“Henriquez”) arrived home from work and, as was his custom, left to walk his dog. While walking his dog, Henriquez spotted an individual dressed in civilian clothes running towards him brandishing a weapon in his hand. Unbeknownst to Henriquez, the individual was a police officer, Agent Dominguez, to be precise. Dominguez detained Henriquez, hitting him twice on the side of the head. Dominguez then patted Henriquez down, finding five dollars on his person. He arrested him and placed him in a police car.
Henriquez repeatedly asked Dominguez why he was under arrest, but to no avail. Upon arriving at the police station, Henriquez was placed in an office while Dominguez spoke to Vélez. Domínguez then requested two bags of drugs from Vélez. On receiving them, he reentered the office in which Henriquez had been detained, gestured to the bags, and told Henriquez, “this is what I got from you, what I seized from you, ... [i]f you help me, I’ll help you.” Dominguez, apparently unsatisfied with Henriquez’s response, decided to release Henriquez soon after. He was about to do so when Henriquez’s neighbor, Pita Marti (“Marti”), an attorney, arrived at the station. Marti stated that he had witnessed the entire incident of Henriquez’s arrest, and that at no time did he see Dominguez seize any drugs from Henriquez. A brief confrontation ensued, causing Dominguez to take Henriquez back inside the station, thereby prolonging his detainment. Later that evening, Henriquez was released. No formal drug possession charges were ever filed against him.
9. Confessions in an Unmarked Police Car
In mid-July 2007, Agents Bosques and Cortés, investigating two individuals named Corinna and Bachan, went on a surveillance assignment in an unmarked police car. The agents observed Corinna leave a house in a car and followed him in their vehicle for a brief period. Despite not observing any illegal acts on Corrina’s part during that time, Bosques testified that Cortés told him “he would ‘dress’ [Corrina] up himself.” Bosques stated he interpreted Cortés’ statement to mean that, when drafting his sworn statement for a search warrant, Cortés would craft the facts in such a manner that they would support the issuance of a warrant.
Also while patrolling, Bosques testified that Cortés spoke to him about a previous arrest, to which he admitted to fabricating the facts. Soon after their surveillance session, Bosques assisted Cortés in drafting a sworn affidavit — containing false information describing events that never took place — to obtain a search warrant against Bachan and Corrina.
10. “Dealing With It” at the El Carmen Housing Project
Bosques went on another surveillance assignment with Agent Ruperto, also in mid-July. Ruperto, one of the higher-ranking officers in the operation, instructed Bosques that he wanted to complete eight arrests that day to satisfy their quo *11 ta. They then traveled to the El Carmen housing project, as Bosques testified, “to intervene with any person who was committing any type of violation against the controlled substances law.”
The plan for the operation was for Bosques, Cortés, and other participating agents to interview various confirmed drug users and record their names and personal information under the guise of locating a drug rehabilitation program for them. This explanation, in fact, was a ploy for the agents’ ongoing practice of inputting such information to generate false arrest reports.
While patrolling, Ruperto told Bosques that he expected him “to catch a motherfucker who’s full of drugs.” When Bosques asked what he should do if he seized an individual with no drugs on his person, Ruperto replied, “[y]ou have to deal with that.” Bosques reminded Ruperto that he was “in zero,” meaning he had just returned from vacation, and thus, had no drugs or substances with which to fabricate a case or an arrest. Ruperto and Bosques continued patrolling and passed the same area in which Dominguez had chased down and arrested Henriquez. Ruperto, remembering the incident, began laughing and remarked, “[Dominguez] did what he had to do.” When Henriquez, by chance, passed by their surveillance point, Ruperto, recognizing him, said, “Look at Flaco, where we arrested him.” [11]
11. The Unraveling of the Conspiracy to Fabricate Criminal Cases and the Search for the Black Box
On July 17, 2007, FBI agents Edwin Dorsey (“Dorsey”) and Julio Tobar (“To-bar”) approached Cortés as he exited a local courthouse. The federal agents told Cortés that they wanted to speak with him regarding the suspected fabrication of cases occurring in his unit at the time, as well as both his and his officers’ participation in such activity. The federal agents invited Cortés into their vehicle for a more private conversation. Federal agent Tobar then stated that he knew Cortés had in his possession at that time two affidavits containing false information that he had authenticated in court. After Tobar read Cortés his rights, Cortés admitted the falsity of the affidavits and confirmed his involvement in the fabrication of other cases in his unit.
Following their conversation, Dorsey and Tobar sought and executed a search warrant to locate and seize the infamous black box containing the contraband. The subsequent search of the drug unit’s premises concluded with the agents’ finding the box in Velez’s desk. They also discovered more controlled substances in a locker inside the unit’s premises.
While the FBI agents were executing the warrant, Division officers, including Bosques, Santiago,[12] Ruperto, and Velez, met outside the building to try to concoct an alibi justifying their possession of various contraband and the black box. A potential plan was to inform the federal agents that the black box had been seized during a search of a housing project. The Division officers met again several days later to discuss the FBI search and confirm their stories. Santiago instructed Vélez to prepare a report, explaining that the *12 black box had been seized during a search of a housing project following a confidential phone call, but that, due to excessive work, he had been unable to draft the report sooner.
On July 21, 2007, Cortés and federal agent Tobar met again. During their meeting, and after Tobar had read Cortés his rights, Cortés admitted that he had participated in the planting of evidence in several of the fabricated cases, listing approximately ten to fifteen instances when he had done so. Cortés additionally admitted to planting evidence approximately twenty times and to executing approximately seventy search warrants containing some degree of false information. Cortés confirmed that during a search of a housing project, he, along with other agents, had gathered information from drug users under the pretense of finding them a rehabilitation program, when in fact the agents were using such data to generate false arrest reports. Lastly, Cortés admitted to giving drugs to Bosques so that he could use them to plant evidence in support of fabricated cases.
On August 23, 2007, a grand jury issued a two-count indictment in the District of Puerto Rico, charging appellants with conspiracy to violate civil rights under 18 U.S.C. § 241, and conspiracy to possess controlled substances with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. Following trial, the jury rendered a verdict, convicting Santiago, Cortés, and Dominguez of both counts and Ruperto, only of count one. The district court subsequently denied appellants’ Rule 29 motions for a judgment of acquittal and sentenced them to differing terms of imprisonment. This appeal followed.
II. Discussion
All appellants challenge their convictions as to count one, with Cortés, Domínguez, and Santiago also challenging their count two convictions.
The standards of review applicable to the issues before us are well-settled. We review a district court’s Rule 29 determination de novo. United States v. Hernández, 218 F.3d 58, 64 (1st Cir.2000). Our case law also clearly holds that a review of a court’s denial of a motion for acquittal “is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant’s guilt beyond a reasonable doubt.” Id. (quoting United States v. Paradis, 802 F.2d 553, 559 (1st Cir.1986)) (internal quotation mark omitted). This standard of review is “formidable, and defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal.” United States v. Rivera-Rodríguez, 617 F.3d 581, 596 (1st Cir.2010) (quoting United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir.2008)) (internal quotation marks omitted). In assessing appellants’ sufficiency of the evidence challenge, we place “no premium ... upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction.” United States v. Ortiz, 966 F.2d 707, 711 (1st Cir.1992).
A. Conspiracy pursuant to 18 U.S.C. § 241
Appellants argue that the government failed to present sufficient evidence showing (1) their respective involvement in or agreement to join the § 241 conspiracy, or (2) any specific intent on each of their parts to so violate citizens’ rights.[13]
*13 1. Standard of Review and Applicable Law
A conspiracy pursuant to 18 U.S.C. § 241 exists where “two or more persons conspire to injure, oppress, threaten, or intimidate any person ... in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States....” 18 U.S.C. § 241. Thus, to convict for such a conspiracy, the government must establish that defendants “1) conspired to injure, oppress, threaten, or intimidate one or more of the victims, 2) with the intent to interfere with the victim’s due process rights, 3) under color of state law.” United States v. Guidry, 456 F.3d 493, 507 (5th Cir.2006); see also 18 U.S.C. § 241; United States v. Vaden, 912 F.2d 780, 781 (5th Cir.1990).
Additionally, because the normal rules for proving a conspiracy apply, the government must show that “(1) a conspiracy existed, (2) the defendants had knowledge of the conspiracy, and (3) the defendants voluntarily participated in the conspiracy.” United States v. Rodriguez-Ortiz, 455 F.3d 18, 22 (1st Cir.2006). Direct or circumstantial evidence will suffice to establish each of these elements. Id. We note that an alleged conspirator’s agreement to participate in a conspiracy “need not be express.” United States v. Lizardo, 445 F.3d 73, 81 (1st Cir.2006). Moreover, “each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it.” United *14 States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir.2002).
Because the facts in this case amply support the determination that a rational trier of fact could have found, beyond a reasonable doubt, that appellants, acting under color of state law, conspired to violate various Mayagüez residents’ rights, we reject appellants’ arguments as to their count one conviction.
2. Analysis
a. Sufficiency of the Evidence
Three cooperating co-conspirators testified, including Muñiz, the Division’s director from 2005 until the date of arrest, and Vélez and Bosques, officers in the Division. We repeatedly have held that “the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible.” United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir.2000) (emphasis added); United States v. Rosario-Díaz, 202 F.3d 54, 67 (1st Cir.2000); United States v. Andújar, 49 F.3d 16, 21 (1st Cir.1995); United States v. Gómez-Pabón, 911 F.2d 847, 853 (1st Cir.1990). Here, we have the corroborated testimonies of three cooperating witnesses, each of which could allow a jury to reasonably infer that appellants were actively involved in the count one conspiracy. Muñiz, Bosques, and Vélez’s testimonies repeatedly established appellants’ voluntary participation in an unlawful scheme to fabricate cases and violate citizens’ constitutional rights. Each provided a detailed overview of the Division’s practice of fabricating cases by planting evidence and falsifying arrest reports. They repeatedly identified active participants, which included appellants, and confirmed one another’s respective testimonies.
The three officers explained that agents generally met at the Division before executing a search warrant or performing other forms of police intervention, at which times Santiago would hand out contraband to agents with instructions to plant evidence to prevent a “negative” search. They described the black box and its location in the office, as well as the source and nature of its contents. Additionally, they specifically detailed various incidents in which Santiago and Muñiz provided officers with drugs to plant evidence to ensure a positive result and to the subsequent consequences of such actions to the citizens in question.[14]
Moreover, none of the witnesses’ respective testimonies was facially incredible. Torres-Galindo, 206 F.3d at 140; Rosario-Díaz, 202 F.3d at 67. Their respective testimonies were vindicatory of the others; defense counsel zealously challenged each witness’ credibility throughout trial; and both sides highlighted the witnesses’ participation in the crimes committed for the jury’s consideration. The credibility and weight to be given to the testimony of these witnesses were classical issues for the jury.
Even if it could plausibly be argued that the testimonies of Muñiz, Bosques, and Vélez were not sufficient to sustain the jury’s determination — a conclusion that is unsupportable on this record — the government also introduced a series of audio and video recordings that corroborated the witnesses’ testimonies and further insulated the conclusion that they conspired to deprive citizens of their constitutional rights.[15]
*15 Appellants’ arguments do little to persuade us that the corroborated and detailed evidence presented at trial was so insubstantial or incredible that the jury’s convictions could not be supported by the weight of the evidence. At most, appellants’ challenges address whether the government satisfied its evidentiary burden of estabhshing their involvement in a conspiracy to violate constitutional rights. However, the case law makes clear that a conspirator’s agreement to participate “need not be express, [and] may consist of no more than a tacit understanding,” United States v. Echeverri, 982 F.2d 675, 679 (1st Cir.1993) (quoting United States v. Glover, 814 F.2d 15, 16 (1st Cir.1987)) (internal quotation marks omitted); “[t]here is no need for a conspirator to know the other participants in the conspiracy,” United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir.2001); “the government need not prove that the defendants] knew all the details ... of the conspiracy,” United States v. Nuevo, 979 F.2d 880, 884 (1st Cir.1992); a conspirator does not have to “realize the full extent of the conspiracy to be found guilty,” Rivera-Ruiz, 244 F.3d at 268; and specific intent may be established through circumstantial evidence alone. United States v. Donato-Morales, 382 F.3d 42, 47 (1st Cir.2004).
Here, the evidence established that various identified officers in the Division (including appellants) met with one another and received contraband with specific instructions to fabricate cases. These officers accepted the contraband and participated in several incidents of planting to ensure positive results. Additionally, the record shows the officers were cognizant of their co-conspirators’ identities, participated in nefarious activities with knowledge as to their illegal object, and understood the overall purpose of the conspiracy. In fact, the evidence establishes that the conspirators often discussed their case-fabrication experiences amongst themselves, and in the last stages of the conspiracy, met to concoct an alibi to explain their possession of the black box and its contraband contents to the investigating authorities that were closing in on them.
The government’s evidence as to count one overwhelmingly clears the requisite evidentiary bar. We thus affirm appellants’ convictions as to the count one conspiracy.
b. Ruperto’s Inconsistent Verdicts Argument
Ruperto raises the separate argument that the jury verdict as to him was unreasonable because he was acquitted of count two, but convicted under count one. He contends that the count one conspiracy involved the fabrication of cases that turned on the conspirators’ intent to use drugs for planting, the latter of which was targeted under count two’s charge. We reject Ruperto’s argument.
Case law is clear that “verdicts are not inconsistent if the elements of the two charged counts are not identical.” United States v. Berbere, 229 F.3d 1134, 2000 WL 1160439, at *1 (1st Cir.2000) (unpublished table decision) (emphasis added). The elements of the charges in counts one (conspiracy to violate citizens’ constitutional rights) and two (conspiracy to possess with intent to distribute a controlled substance) are different: one is a violation of rights charge and the other a drug distribution charge. Even if the verdicts could somehow be deemed inconsistent, “the Supreme Court has made it clear that verdict inconsistency in itself is not a sufficient basis for vacating a conviction,” United States v. López, 944 F.2d 33, 41 (1st Cir.1991), provided that “the appellate court is satisfied that there was suffi *16 cient evidence to sustain the counts of conviction.” United States v. Sullivan, 85 F.3d 743, 747 (1st Cir.1996). Here the evidence, in the form of various cooperating witnesses’ testimonies and audio and video recordings, was sufficient to show that Ruperto conspired with his co-conspirators to violate individuals’ rights. It is not our role to “weigh[ ] the credibility of the witnesses nor attempt!] to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant’s innocence.” Berbere, 229 F.3d at 1134, 2000 WL 1160439, at *1 (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir.1997)). Because the evidence supports the jury’s conviction as to count one, we reject Ruperto’s challenge and affirm his count one conviction.
B. Conspiracy Pursuant to 21 U.S.C. §§ 841(a)(1) & 846
Santiago, Cortés, and Dominguez argue that the evidence was insufficient to convict them of conspiring to possess controlled substances with an intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. Cortés and Dominguez further state, but do not develop an argument, that a conspiracy by law enforcement officers to plant controlled substances on victims in order to fabricate criminal cases does not entail the specific intent to distribute within the meaning of § 841(a)(1). We disagree. Because the express language of the statute encompasses defendants’ conduct, and there is no expression of contrary intent, and because the evidence amply supports the verdict, we affirm their conviction under count two.
Our review of the district court’s Rule 29 determinations is de novo. Hernández, 218 F.3d at 64. “However, our review of the district court’s decision to deny a motion for acquittal is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant’s guilt beyond a reasonable doubt.” Id. (quoting Paradis, 802 F.2d at 559) (internal quotation marks omitted). In applying this standard, “no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction.” Id. (quoting Ortiz, 966 F.2d at 711) (internal quotation marks omitted). Nor may we weigh the evidence or make credibility judgments, as these tasks are reserved to the jury. Id. Instead, we “must uphold any verdict that is ‘supported by a plausible rendition of the record.’ ” Id. (quoting Ortiz, 966 F.2d at 711).
“As with any question of statutory interpretation, our analysis begins with the plain language of the statute.” Jimenez v. Quarterman, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009); see also Recovery Grp., Inc. v. Comm’r, 652 F.3d 122, 125 (1st Cir.2011). The Controlled Substances Act, as codified at 21 U.S.C. § 841(a)(1), makes it “unlawful for any person [to] knowingly or intentionally ... manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.” 21 U.S.C. § 841(a)(1). Section 846, in turn, provides that “[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.” Id. § 846.[16]
*17 Under the plain language of § 841(a)(1), a prima facie case of possession with intent to distribute requires a showing that the defendant (1) knowingly and intentionally possessed; (2) a controlled substance; (3) with the specific intent to distribute. United States v. Garcia-Carrasquillo, 483 F.3d 124, 130 (1st Cir.2007).
It is the third element, specific intent to distribute, with which defendants take issue. Specific intent requires a showing that the defendant intended the proscribed outcome as his purpose. United States v. Dyer, 589 F.3d 520, 528 (1st Cir.2009). This raises two related issues: what constitutes “distribution” within the meaning of the statute, and, given the meaning of that term, whether the conspirators had the requisite specific intent to distribute required by the statute.
1. The Meaning of “Distribute”
The term “distribute” is defined under the Controlled Substances Act as “to deliver (other than by administering or dispensing) a controlled substance or a listed chemical.” 21 U.S.C. § 802(H).[17] The Act defines “deliver” as “the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship.” Id. § 802(8). Although the Act does not define the term “transfer,” we may interpret this word by reference to its commonly accepted meaning. See United States v. Collazo-Castro, 660 F.3d 516, 520 (1st Cir.2011) (“[W]e begin with the ordinary meaning of the terms,” which we may decipher by “consulting] dictionary definitions, interpretations given to the same terms by judicial construction, and the statutory context in which the words are used.”) (quoting Hernández-Miranda v. Empresas Diáz Massó, Inc., 651 F.3d 167, 171 (1st Cir.2011) (internal quotation marks omitted)), cert. denied — U.S. -, 132 S.Ct. 1593, 182 L.Ed.2d 204 (2012). To transfer means “to carry or take from one person or place to another ...; to move or send to a different location ...; to cause to pass from one person or thing to another.” Webster’s Third New International Dictionary 2426-27 (1993); see also Oxford English Dictionary (2d ed.1989), available at http://www.oed.com (defining “transfer” as “[t]o convey or take from one place, person, etc. to another; to transmit, transport; to give or hand over from one to another”); Black’s Law Dictionary 1636 (9th ed.2009) (defining “transfer” as “[a]ny mode of disposing of or parting with an asset”).
Courts, including this one, have held that “distribute” is defined broadly under § 841(a)(1). See United States v. Castro, 279 F.3d 30, 34 (1st Cir.2002) (“Section 841(a)(1) contains a broad prohibition on distribution.... ”); see also United States v. Birbragher, 603 F.3d 478, 485 (8th Cir. 2010) (describing § 841 as a “broad prohibition on the distribution of controlled substances”); United States v. Wallace, 532 F.3d 126, 129 (2d Cir.2008) (explaining that use of the broad terms “distribute” and “deliver” bespeaks a congressional intent “to proscribe a range of conduct broader *18 than the mere sale of narcotics” (quoting United States v. Washington, 41 F.3d 917, 919 (4th Cir.1994) (internal quotation marks omitted))); United States v. Tingle, 183 F.3d 719, 727 n. 3 (7th Cir.1999) (“Courts usually interpret the term ‘distribution’ and related words quite broadly.”); Washington, 41 F.3d at 919 (“[I]n enacting the 1970 Act, Congress intended to proscribe a range of conduct broader than the mere sale of narcotics.”); United States v. Catchings, 922 F.2d 777, 779 (11th Cir. 1991) (per curiam) (rejecting a “narrow construction of ‘distribute’ ” and stating that the circuit “interprets] distribution broadly”); United States v. Luster, 896 F.2d 1122, 1127 (8th Cir.1990) (“Courts have interpreted the term ‘distribute’ under subsection 841(a) quite broadly....”); United States v. Ahumada-Avalos, 875 F.2d 681, 683 (9th Cir.1989) (per curiam) (“The courts usually interpret the term ‘distribution’ quite broadly.”); United States v. Brunty, 701 F.2d 1375, 1381 (11th Cir.1983) (“Cases involving distribution under § 841(a) support a broad construction of the offense.”).
Defendants’ conduct here falls within the language of the statute. The jury found that the defendants agreed, voluntarily and knowingly, to take the drugs, either from the black box in Santiago’s office or from one another, and to intentionally transfer, and so distribute, those drugs to the victims’ persons or property in their proximity. They did this so that the drugs would be “discovered” by officers, giving cause for the victims’ arrest. The defendants’ acts of transferring the drugs amongst each other and to the victims constitutes an intent to distribute the drugs under § 841(a)(1), which results in a transfer of possession of a controlled substance, in other words, a “distribution.” “[W]here, as here, the statute’s language is plain, ‘the sole function of the courts is to enforce it according to its terms.’ ” United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)); see also People To End Homelessness, Inc. v. Develco Singles Apartments Assocs., 339 F.3d 1, 6 (1st Cir.2003).
“Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.” Albernaz v. United States, 450 U.S. 333, 336, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (quoting Consumers Prod. Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)) (internal quotation marks omitted). There is no clearly expressed legislative intention to the contrary here, so we regard the text as conclusive. There is no language anywhere in the statute which supports defendants’ argument of non-coverage. Rather, as explained later, there is other language which works to the contrary.
Application of § 841(a)(1) here is supported not only by the language but by the fact that this language reflects a deliberate choice by Congress to use broad language. “The Comprehensive Drug Abuse Prevention and Control Act of 1970 is extremely broad in scope, no longer restricted to the narrower concepts of buy and sell, but all inclusive in covering the entire field of narcotics and dangerous drugs in all phases of their manufacturing, processing, distribution and use.” United States v. Pruitt, 487 F.2d 1241, 1245 (8th Cir.1973). Before the enactment of the Act, a participant in an illegal drug transaction had to be punished as either a seller or a buyer. Id. (citing United States v. Moses, 220 F.2d 166, 168 (3d Cir.1955)).
Congress, recognizing that narcotics typically pass through several hands be *19 fore reaching the ultimate user, opted to view the transaction as a whole and intended to make illegal participation at any and all stages. As a result, “[a]ny individual who participates in any manner in the unauthorized distribution of such ‘controlled substances’ is amenable to the Act and the sanctions provided therein.” Id. (emphasis added); Brunty, 701 F.2d at 1381; United States v. Wigley, 627 F.2d 224, 226 (10th Cir.1980) (per curiam).
Based on this deliberate choice not to restrict § 841, including to buying or selling, courts have concluded that “Congress undoubtedly intended by this new Act to make an all-out attempt to combat illicit drugs” by targeting “any individual who knowingly participates in the distribution” in any way. Pruitt, 487 F.2d at 1245. “The distribution provision has been held to criminalize ‘participation in the transaction viewed as a whole.’ ” Ahumada-Avalos, 875 F.2d at 683 (quoting Brunty, 701 F.2d at 1381); see also Pruitt, 487 F.2d at 1245; Wigley, 627 F.2d at 226. “Courts have interpreted the term ‘distribute’ under subsection 841(a) quite broadly to include not only the transfer of physical possession, but also other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price.” Luster, 896 F.2d at 1127 (quoting Brunty, 701 F.2d at 1381) (internal quotation marks omitted). The defendant need not even “actually touch[] or physically possess[ ] the drug” to be convicted under § 841. Catchings, 922 F.2d at 779-80 (citing United States v. Oquendo, 505 F.2d 1307, 1310 (5th Cir.1975)); see also, e.g., United States v. Tejada, 886 F.2d 483, 490 (1st Cir.1989) (“[P]roof of distribution does not necessarily include the element of possession.”); United States v. Collins, 552 F.2d 243, 245-46 (8th Cir.1977) (holding that defendant was properly convicted of distributing heroin under § 841(a) even though he did not physically transfer the heroin but was a conduit in the exchange of money).
In accord with this view of the term “distribute,” we have recognized that distribution takes place in a wide variety of contexts and the relevant question is not the ultimate objective. For instance, we have stated that “[wjhether or not sharing [drugs] with a girlfriend is often so prosecuted, it is as much ‘distribution’ as selling on a street corner.” United States v. Boidi, 568 F.3d 24, 29 (1st Cir.2009). Likewise, we have noted that “[i]t is well accepted that drugs may be distributed by giving them away for free; 21 U.S.C. § 841(a)(1) imposes no requirement that a sale take place.” United States v. Cormier, 468 F.3d 63, 70 n. 3 (1st Cir.2006). The underlying goal of the distribution is, under the plain language of the statute, irrelevant to the question of whether there was a “distribution.” See United States v. Santistevan, 39 F.3d 250, 255 n. 7 (10th Cir.1994) (stating that an “improper motive” is not required under the statute).
Furthermore, the statute carves out specific exceptions for legitimate activities which do not include the conduct here, and which require the statute to be read against defendants’ arguments. Congress was well aware of the question of legitimate handling of drugs, for it carved out exceptions, but those exceptions do not include the activities in which these defendants engaged.
In one exception, Congress determined that distribution of drugs by certain registered persons is lawful:
Every person who ... distributes any controlled substance or list I chemical, or who proposes to engage in the ... distribution of any controlled substance or list I chemical, shall obtain annually a registration issued by the Attorney Gen *20 eral in accordance with the rules and regulations promulgated by him.
21 U.S.C. § 822(a)(1).
Under 21 U.S.C. § 822(b), “[p]ersons registered ... [to] distribute ... controlled substances or list I chemicals are authorized to possess ... [or] distribute ... such substances or chemicals ... to the extent authorized by their registration____” Id. § 822(b). These defendants are not registered persons authorized to distribute drugs, and so are not part of the legitimate distribution channels.[18]
Even more importantly, Congress carved out a specific exemption for distribution of controlled substances by law enforcement officers, but only to the extent that they are “lawfully engaged” in the enforcement of drug laws. See id. § 885. Section 885 provides:
(d) Immunity of Federal, State, local and other officials
Except as provided in sections 2234 and 2235 of title 18, no civil or criminal liability shall be imposed by virtue of this
subchapter[19] upon any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter, or upon any duly authorized officer of any State, territory, political subdivision thereof, the District of Columbia, or any possession of the United States, who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances.
Id. § 885(d) (emphasis added); see also H.R.Rep. No. 91-1444 (1970), reprinted in 1970 U.S.C.C.A.N. 4566, 4625 (explaining that this provision “exempts federal officers from liability when lawfully engaged in enforcing Title II and further exempts state and local officers when lawfully engaged in enforcing any law relating to controlled substances”). There has never been any claim at trial or on appeal that these defendants are entitled to that immunity.
This provision protects accepted law enforcement tactics such as sting or reverse-sting operations in which officers handle and transfer drugs,[20] the transfer of sus *21 pected drugs to DEA laboratory agents for analysis,[21] or to a clerk of court in the course of presenting evidence at trial, none of which could give rise to prosecution under § 841.
Because only those officers “lawfully” enforcing the controlled substances laws are protected under § 885, the existence of § 885(d) evidences that law enforcement officials who do not fall within that immunity and who exceed lawful enforcement techniques may be prosecuted under the statute. Police officers who plant drugs on persons in order to create a false basis for arrest are not “lawfully engaged” in law enforcement activities, and thus under the plain language of the statute they may be prosecuted for distribution. Further, Congress contemplated that the provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 would apply to the unlawful conduct of law enforcement officers, like the conduct at issue here, or there would be no reason to have enacted this provision.
Indeed, a plurality of the Supreme Court has explained that “[i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.” Hampton v. United States, 425 U.S. 484, 490, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (plurality opinion) (emphasis added). This was said in the context of rejecting a defendant’s argument that the conduct of law enforcement agents in a reverse-sting narcotics operation required vacating the defendant’s conviction. See id.
Moreover, the immunity in § 885 is itself subject to two limits, evidencing that officers who exceed their authority are not to be given immunity. Officers whose conduct violates 18 U.S.C. § 2234 or § 2235 are not entitled to immunity. See 21 U.S.C. § 885(d). Section 2234 provides a criminal penalty for any person who “in executing a search warrant, willfully exceeds his authority or exercises it with unnecessary severity.” 18 U.S.C. § 2234. Section 2235 provides a criminal penalty for “[w]hoever maliciously and without probable cause procures a search warrant to be issued and executed.” Id. § 2235. These provisions evidence that Congress expressly intended that officers engaged in unlawful search and seizure techniques are not entitled to immunity under § 885 and may therefore be prosecuted under the Act.[22]
Here, these defendants were not “lawfully engaged in the enforcement of any *22 law or municipal ordinance relating to controlled substances.” The evidence was overwhelming that their actions were taken in violation of official duties. Indeed, defendants do not even argue that § 885 applies to their conduct. There is a good reason for that. The defense is unavailable. These actions were not authorized by the functions of their law enforcement positions.[23] To apply the statute to the conduct of these defendants is neither absurd nor does it threaten, in the least, accepted law enforcement techniques.[24] Moreover, the federal government, acting through the United States Attorney for Puerto Rico, has taken the position that such prosecution is permissible and appropriate under § 841.
The dissent argues that the statute must be interpreted to preclude these prosecutions because there have been no decisions on prosecutions under § 841 for the planting of drugs as here (albeit there have been reported decisions under § 841 for other illegal actions by police, such as distributing drugs for sale).[25] But whether prosecutors exercise their discretion to prosecute does not say anything about the scope of an enacted statute. Further, that there are no reported decisions on these precise facts says nothing about the incidence rate of similar misconduct (which one hopes is rare) and nothing about whether similar prosecutions were brought but did not result in reported decisions. Moreover, Congress and the Constitution have given the Executive Branch some prosecutorial discretion as to when to prosecute. No such discretion is given to the Judicial Branch to invalidate convictions on the basis of whether or not there have *23 been few prosecutions on similar facts in the past. Here there have been widespread and well-documented abuses of local police power in this jurisdiction, particularly as to the massive criminal drug conspiracies which afflict Puerto Rico. See, e.g., United States v. Flecha-Maldonado, 373 F.3d 170, 172, 174 (1st Cir.2004). Defendants do not claim there was some improper motive for the prosecution, nor could there have been. Indeed, bringing prosecutions to deter such conduct is entirely appropriate.
In short, both the language and the intent of § 841(a) is such that it applies to the conduct at issue in this case.
2. Specific Intent to Distribute
We turn to the defendants’ argument that the evidentiary record does not support a conspiracy with the object of possessing controlled substances with an intent to distribute under 21 U.S.C. §§ 841(a)(1) & 846.
As said, specific intent requires a showing that the defendant intended the proscribed outcome as his purpose. Dyer, 589 F.3d at 528. In the context of a charge of conspiracy to “possess with intent to ... distribute” controlled substances, 21 U.S.C. § 841(a)(1), the relevant specific intent the defendants must have is a specific intent “to distribute” the controlled substances, see, e.g., United States v. Rivera-Donate, 682 F.3d 120, 133 (1st Cir.2012) (“To prove the underlying offense of ‘possession with intent to distribute, the government must show that the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute.’ ” (quoting Garcia-Carrasquillo, 483 F.3d at 130) (emphasis added)). The evidence is that there was a transfer of drugs between the officers followed by the planting of drugs to facilitate arrests, which amounts to distribution; it follows that the intent to take those actions satisfies the specific intent requirement of the statute.
The relevant intent here is the “intent to distribute.” The dissent argues that because the officers’ intent was to fabricate cases by planting evidence, the officers cannot have had the specific intent to distribute the drugs. This argument conflates the specific intent to distribute required by the statute with the very different question of the ultimate objective. Only the former is an element of the statute; the ultimate objective is not a part of the statutory test. That this was Congress’s intent is shown not only because there is no reference to the ultimate objective as a matter of statutory language, but also because Congress decided not to make buying or selling elements of the offense. What matters as to specific intent is that the defendant intended to transfer the drugs to someone else.[26] See Boidi, 568 *24 F.3d at 29; Cormier, 468 F.3d at 70 n. 3; Santistevan, 39 F.3d at 255 n. 7.
The dissent also suggests that specific intent to distribute the drugs requires that the defendant intend to either further the incidence of drug abuse or intend to introduce or circulate the drugs into society’s illicit drug market channels. This is not the test for specific intent under § 841, and no court has so held.
The dissent further argues that the specific intent to commit this particular offense cannot be inferred from the actions undertaken by defendants to distribute the drugs. We disagree. The defendants were not charged with distribution; they were charged with conspiracy to possess with intent to distribute controlled substances. The fact that the defendants did in fact distribute the drugs is quite properly considered in determining whether the defendants had earlier entered into a conspiracy to possess with intent to distribute such drugs. See United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir.2009) (evidence that the defendant “repeatedly provided crack” to individuals for resale “alone provided a sufficient basis to infer that [the defendant] knowingly and intentionally joined an agreement to distribute crack”); United States v. Smith, 233 Fed.Appx. 297, 300 (4th Cir.2007) (“By assisting Smith in the actual distribution of crack ..., it was reasonable for the jury to infer that Carr knew Smith was involved in the illegal distribution of a controlled substance and knowingly participated in Smith’s possession of crack cocaine with the intent to distribute.”); United States v. Childress, 58 F.3d 693, 728-29 (D.C.Cir. 1995) (defendant’s acts of delivering bags containing drugs “would normally support an inference that he had the specific intent to further the object of the conspiracy” to distribute and to possess with intent to distribute); United States v. Douglas, 874 F.2d 1145, 1159 n. 24 (7th Cir.1989) (where defendant “was charged with conspiracy to possess with intent to distribute,” the “[e]videnee of [the defendant’s] drug distribution before and after the purchases from [another individual] is probative of [the defendant’s] intent with regards to the drugs he bought ... did he possess the drugs with intent to distribute them?”); United States v. Thomas, 551 F.2d 347, 348 (D.C.Cir.1976) (per curiam) (where defendant is charged with possession with intent to distribute, testimony that an “actual drug sale” took place is “directly probative” of the defendant’s intent to distribute the drug).
Further, the evidence, “taken as a whole and in the light most favorable to the prosecution,” United States v. Lopez-Lopez, 282 F.3d 1, 19-20 (1st Cir.2002), would permit a rational jury to determine beyond a reasonable doubt that the defendants were guilty of conspiring to possess with intent to distribute a controlled substance in violation of § 841(a)(1) and § 846.
The evidence at trial included the testimony of three co-conspirators: Lieutenant Dennis Muñiz, the director of the Division from 2005 to 2007, as well as Luis Velez and José Bosques, two officers in the Division. All three witnesses described the distribution chain, namely the pattern by which Santiago and Muñiz would distribute illegal drugs to officers with instructions to transfer the evidence to the victim’s person, property, or presence in order to yield *25 a “positive” search. The testimony identified the active participants in the scheme, which included all three of the defendants here. This testimony was corroborated by a series of audio and video recordings showing that the defendants transferred the drugs both amongst one another and to the victims.
The witnesses described particular instances in which at least one of the defendants transferred drugs to the victims, many of whom were known drug leaders and dealers. All three defendants were identified as having participated in at least one such planting. The drugs were generally transferred to the drug leaders’ property or presence in the hope that other officers would subsequently discover them and arrest the victim before the drugs could be transferred again. For example, at the home of Omayra Segarra, a/k/a “Pu-chi,” a known drug leader, the drugs were left both on a shelf in the closet and in Puchi’s vehicle. Other officers eventually came upon the planted evidence and used it to make an arrest. Similarly, at José “El Monstruo’s” home, the drugs were left in a closet next to the bathroom before any officers initiated a search. Other officers later came upon the evidence when searching and, again, used it to make an arrest. At two housing projects, Monte Isleño and the Columbus Landing project, both of which were known sites of drug activity, the drugs were placed in a bureau drawer and a pile of men’s shoes, respectively, and left there to be later discovered by other searching officers.
To the extent the defendants challenge the credibility of the government’s witnesses, our sufficiency analysis does not permit us to “‘assess the credibility of a witness, as that is a role reserved for the jury.’” United States v. Rivera-Rodriguez, 617 F.3d at 595 n. 6 (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)); see also United States v. Calderon, 77 F.3d 6, 10 (1st Cir.1996) (“It [is] well within the jury’s province for it to choose to believe the testimony of [the defendant’s] accomplices — in the face of ... cross-examination of their characters and motives — and to disbelieve [the defendant’s] version of the story.”). In any event, the testimony of each witness was corroborated, not only by the testimony of the other witnesses, but also by the audio and video recordings.
The evidence of a conspiracy to possess with intent to distribute goes beyond the officers’ actual physical acts of transferring and planting of drugs, and includes numerous instances of discussion as to distribution and planting of drugs among the officers before, during, and after the arrests! The witnesses testified that the defendants regularly met at the Division before executing a search warrant, at which point Santiago would hand out drugs to agents with instructions to transfer the drugs to the victims’ persons, property, or presence in order to fabricate a “positive” search.[27]
*26 The testimony also identified several instances in which the co-conspirators did the planting in teams and/or discussed with one another the incidents of evidence planting. The witnesses also testified that, when the FBI executed a search warrant to locate and seize the black box, several of the co-conspirators met to try to concoct an alibi for their possession of the box and the drugs it contained.
We conclude that the verdict here was “supported by a plausible rendition of the evidence,” taken as a whole and in the light most favorable to the prosecution, and so we do not disturb the jury’s verdict. Lopez-Lopez, 282 F.3d at 19-20. We acknowledge that our result is driven by the plain language of the statute and its history, and that Congress may not have anticipated this precise scenario in writing the statute. If Congress disagrees with this outcome, it is free to amend the statute. The defendants’ convictions under count two are affirmed.
C. Sentencing Challenges
Appellants Dominguez, Santiago, and Ruperto raise individual challenges to their respective sentences. We address each challenge in turn. We review the district court’s interpretation and application of the sentencing guidelines de novo and factual findings for clear error. United States v. Aguasvivas-Castillo, 668 F.3d 7, 13 (1st Cir.2012).
1. Dominguez’s Challenge
Dominguez argues that the district court erred in its determination of the drug quantity to use in sentencing Dominguez for his role in the conspiracy as to count two. This challenge fails.
The district court sentenced Dominguez to 40 months’ imprisonment as to count one and 78 months’ imprisonment as to count two, to be served concurrently, based on a guidelines range of 78 to 91 months.[28] The district court found that counts one and two resulted in a combined base offense level of 28, and that no adjustments applied. The base offense level for count two was calculated based on the quantity of drugs involved in the offense. See U.S.S.G. § 2Dl.l(a)(3) (2008).
The quantity of drugs the district court used for guidelines calculations purposes was the quantity of drugs seized when the FBI searched the defendants’ offices on July 17, 2007, which amounted to 6.8 grams of crack cocaine, 3.91 grams of heroin, and 86.4 grams of marijuana. These drugs were found in three locations: the black box, an area of Santiago’s office, and a hiding spot in the ceiling. This translated to a drug quantity value of between 100 and 400 kilograms of marijuana. See id. § 2D1.1 cmt. n. 10(B) (2008) (stating that the drug equivalency tables in the guidelines “provide a means for combining differing controlled substances to obtain a single offense level”).
Under the guidelines, although advisory, the quantity of drugs attributable to a defendant for sentencing purposes is based on both the charged conduct and the relevant uncharged conduct. United States v. González-Vélez, 587 F.3d 494, 508 (1st Cir.2009); see also U.S.S.G. *27 § 1B1.1 cmt. n. 1(H) (2008) (defining the term “[o]ffense” as including “the offense of conviction and all relevant conduct under § 1B1.3”). Relevant conduct includes, “in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.” U.S.S.G. § lB1.3(a)(l)(B) (2008). Accordingly, in the drug conspiracy context, “each coeonspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy.” United States v. Santos, 357 F.3d 136, 140 (1st Cir.2004).
We review drug quantity determinations in two steps. First, we review de novo “whether the district court’s drug quantity determination was based on an individualized determination” of the “quantity of drugs attributable to, or reasonably foreseeable by, the offender.” United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir.2010). If the district court made such an “individualized determination, our review is for clear error.” Id.
Dominguez contends that the district court erred in determining that he was sufficiently close to the conspiracy such that the quantity of drugs seized was reasonably foreseeable to him. We reject this challenge.
The district court made an individualized determination. The district court recognized that the amount of drugs seized could not be attributed to Dominguez unless the drugs were reasonably foreseeable to Domínguez. The district court found that this was a closely knit conspiracy to plant drugs to obtain arrests, that Dominguez knew about the black box being one of the sources of drugs, and had been seen with the black box. The district court also found that Dominguez was close to the leaders of the conspiracy and had participated in two acts of planting drugs, at least one of which was with drugs from the black box.[29] The district court concluded, based on this evidence, that the quantity of drugs seized was reasonably foreseeable to Dominguez.
Because an individualized determination was made, clear error review applies. We will only reverse for clear error if “upon whole-record review, an inquiring court ‘form[s] a strong, unyielding belief that a mistake has been made.’ ” Id. at 6 (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir.1990)).
There was no clear error. Dominguez does not dispute the quantity of drugs seized, but rather only argues that the quantity was not reasonably foreseeable to him. It was not clear error for the district court to find the quantity reasonably foreseeable to him, given the evidence outlined above. We affirm Dominguez’s sentence.
2. Santiago’s Challenge
Santiago challenges the district court’s imposition of a three-level enhancement for his role in the offense under U.S.S.G. § 3Bl.l(b).[30] Santiago also asserts, but does not develop an argument, *28 that his sentence as a whole is unreasonable. Both challenges fail.
Section 3Bl.l(b) provides that “[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.” Id. Santiago concedes that “the criminal activity involved five or more participants or was otherwise extensive,” but argues that he was not a “manager or supervisor” within the meaning of the provision, and so the enhancement was unwarranted. This argument fails.
While the guidelines do not define the term “supervisor” or “manager,” we have held that “[e]vidence of the defendant’s role in the conspiracy ‘may be wholly circumstantial,’ and need only show that he ‘exercised authority or control over another participant on one occasion.’ ” United States v. Flores-de-Jesús, 569 F.3d 8, 34 (1st Cir.2009) (quoting United States v. García-Morales, 382 F.3d 12, 19-20 (1st Cir.2004)); see also United States v. Cruz, 120 F.3d 1, 3 (1st Cir.1997) (en banc) (stating that the analogous enhancement based on “organizer, leader, manager, or supervisor” status in U.S.S.G. § 3Bl.l(c) applies if “the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons”). For the enhancement to apply, it is not enough to show that “the defendant merely controlled, organized, or managed criminal activities; rather, he must instead control, organize, or manage criminal actors.” Flores-de-Jesús, 569 F.3d at 34 (quoting United States v. Ofray-Campos, 534 F.3d 1, 40 (1st Cir.2008)) (internal quotation marks omitted).
In this case, there was extensive testimony as to Santiago’s role in supervising or managing the conspiracy. Santiago’s official position was as a supervisor in the division. The witnesses testified that Santiago was in charge of maintaining the black box and distributing the drugs to the other officers before search operations. When Santiago was out of town in July 2007, he transferred the box to Vélez, so that Vélez could provide the officers drugs in his absence. During a variety of searches, Santiago issued instructions as to the planting of drugs. For instance, before the search of José “El Monstruo’s” home, Santiago provided bags of cocaine and marijuana to Vélez, with instructions to wait for a call from Santiago and Muñiz; Santiago and Muñiz called Vélez during the search with instructions to plant the drugs. Similarly, before the search of “Puchi’s” residence, Santiago provided Vélez with cocaine and marijuana along with instructions that the search had to result in an arrest. Santiago later arrived at the scene, after discussing the situation with Vélez over the phone. When Vélez protested that he did not want to plant the drugs, Santiago told him to do so, and Vélez complied; Santiago later instructed Vélez to retrieve the drugs, and Vélez again complied. Bosques testified that “Santiago was the one who ordered me to do whatever work.”
In light of this evidence, the district court did not err in finding that Santiago “exercised authority or control over another participant on [at least] one occasion.” Id. (quoting Garciar-Morales, 382 F.3d at 19-20 (internal quotation marks omitted)).
Santiago also asserts without analysis that the overall sentence was unreasonable, and so has waived this challenge. Even bypassing waiver, the argument fails on its own terms. The district court properly calculated the guidelines range, so we review the reasonableness of the sentence for an abuse of discretion. Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); United *29 States v. Ozuna-Cabrera, 663 F.3d 496, 503 (1st Cir.2011), cert. denied, — U.S. -, 132 S.Ct. 1936, 182 L.Ed.2d 794 (2012). The district court considered the sentencing factors outlined in 18 U.S.C. § 3553(a), including Santiago’s years of service, and concluded that it was appropriate to sentence Santiago “to the lower end of the applicable guidelines.” The applicable guidelines range was 108 to 135 months, and the district court sentenced Santiago to 108 months’ imprisonment for count one as well as count two, to be served concurrently.[31] Santiago bears a “heavy burden” of showing that this sentence within the guidelines range was unreasonable, which he has not met. Ozuna-Cabrera, 663 F.3d at 504. Further, “a sentence will withstand a substantive reasonableness challenge so long as there is ‘a plausible sentencing rationale and a defensible result,’ ” as was the case here. Id. (quoting United States v. Martin, 520 F.3d 87, 96 (2008)). Santiago’s challenge fails and we affirm his sentence.
3. Ruperto’s Challenge
Ruperto asserts that the district court erred in applying the sentencing guidelines when determining his sentence. We review the district court’s interpretation of the sentencing guidelines de novo. United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009).
Ruperto argues that the district court erred when it computed his advisory guideline range because it applied U.S.S.G. § 2J1.2,[32] which he asserts is not applieable to his underlying offense, instead of U.S.S.G. § 2H1.1.[33] A review of the record establishes that the district court did as appellant zealously advocates it should have done and applied § 2H1.1.
The record shows that the district court held two hearings concerning Ruperto’s sentencing. During the second hearing, held on July 31, 2009, the district court decided to apply guideline 2H1.1. The transcript from that hearing reveals the following exchanges:
[Appellant’s Counsel]: As we addressed in our opposition to the Government’s informative motion, we represent no opposition to guideline 2H1.1 and the 12 level base offense level that is contained there.
The Court: That[ guideline 2H1.1J is the one I am going to use.
# if:
[Appellant’s Counsel]: ... And we are basically in agreement with the Court that 2H1.1 is the guideline to apply in this case.
The Court: 2H1.1 is the one I’m going to apply.
The Court: ... Since the Defendant was a public official at the time of the offense and the offense was committed under color of law, a six level increase is applied pursuant to United States Guidelines 2H1.1(b)1.
The Court: Yes, this Defendant’s report should also be amended to include the *30 following, the 2H1.1, the six-level increase and the four levels of supervisory-conduct.
(Emphasis added).
Ruperto, in essence, is stepping up to the plate when the players have already cleared the field. We find no error in the district court’s interpretation or application of the sentencing guidelines to Ruperto, and we therefore affirm.
III. Conclusion
We are both disturbed and disheartened by the incidents underlying this appeal. Appellants, as police officers, held positions of authority that society regards with admiration and respect, and which it trusts to safeguard our freedoms, not infringe upon them; to protect us from harm, not be the instigator thereof; and to stand the post, not be the cause for the watch. As often echoed, with great power comes great responsibility,[34] and appellants showed themselves susceptible to corruption’s tarnishing influence often found lapping at the shores of such power. Simply put, appellants disregarded the honorable integrity of their guardian role, and civil liberties were dealt the tragic blow. We can express no greater disapproval or remorse than this: we are saddened and indignant that today, it falls to us to assume the role of guarding the guardians.

Affirmed.

. Chief Judge Lynch writes the opinion of the court as to the issues considered in Part II.B, Part II.C.l, and Part II.C.2, which Judge Stahl joins. See infra.

. This expression is most commonly translated as, "Who watches the watchmen?” Juvenal. Satires, "Satire VI: The Decay of Feminine Virtue.”

.In total, ten defendants were indicted for their roles in the charged conspiracies. We limit our discussion to those appellants presently before us.

. Because Ruperto only was convicted of count one, he limits his conviction challenge to whether the government met its burden of showing his involvement in a conspiracy pursuant to 18 U.S.C. § 241.

. The Division had a quota of arrests that officers were required to complete every week. If officers failed to satisfy the Division's quota they could face administrative repercussions, such as a change in position. The government challenges appellants' contentions that their actions were motivated by any such quota, noting that in certain instances, Division members exacted a personal vendetta against particular "marks” through case fabrication. Appellants’ motivation in this particular respect is immaterial to establishing the illegality of their actions.

. Officers repeatedly used the term, "positive,” to refer to a search that had to produce grounds for an arrest, such as the discovery of contraband or other illegal material. We use the term in like fashion throughout this opinion.

. We acknowledge at the outset that the record does not show the subsequent consequences or ramifications for those citizens implicated in the described fabricated cases and false arrests, nor does it specifically confirm the charges for which the various arrestees were processed. Where such information is available in the record, it is so noted.

.The record does not establish the full name of José, a/k/a "El Monstruo.” As can be discerned, “El Monstruo” means "The Monster” in the Spanish language.

. Testimony at trial clarified that a "preventive round” occurs when officers patrol to maintain security and inhibit the occurrence of crime through their presence.

. The exact date when Agent Bosques first began cooperating with the FBI is not clear from the record. What is clear, however, is that Bosques often wore a concealed recording device to document his interactions with the conspiring officers.

. At trial, Bosques explained that Ruperto’s reference to "Flaco" was his means of referring to Henriquez.

. Agent Santiago had recently returned from vacationing in the Dominican Republic, arriving the day of the FBI’s search of the Division. Testimony at trial established that Santiago had given the black box to Vélez prior to his vacation.

. In contesting the sufficiency of the evidence supporting their count one convictions, appellants raise the following additional arguments unique to their respective appeals.
*13 Santiago contends that the government did not identify nor present testimony from a victim whose rights actually were harmed by Santiago. Moreover, Henriquez, the only witness-victim whom the government did offer, identified Domínguez and Cortés as his perpetrators and misidentified one of the conspirators at trial, weakening his credibility.
Dominguez argues that the specific instances for which the government offered evidence in support of appellants’ alleged violations did not prove the occurrence of unlawful arrests; rather, the evidence showed that "there was founded reason to believe that [the arrested] individuals had engaged in unlawful conduct.” Further, Dominguez contends that in none of the alleged incidents was he specifically identified to have been carrying or planting baggies of drugs. Lastly, even if any of the alleged conspiratorial acts in fact occurred, Dominguez asserts that such actions were carried out pursuant to superiors’ orders, weighing against a finding of liability as to count one.
Ruperto likewise argues that the evidence offered at trial showed, at most, that any actions undertaken on his part were performed pursuant to superiors' orders. Moreover, testimony at trial confirmed that any interventions in which he participated were legitimate. No evidence showed Ruperto had any knowledge as to other officers’ planting of false evidence; that he ever asked or ordered another officer to fabricate a case; or that he himself so planted evidence.
Ruperto also notes that he only was convicted of the count one conspiracy, but not of the count two conspiracy. Ruperto contends the only evidence presented as to count one turned on the same wrongdoing — appellants’ alleged use of illegal drugs to fabricate cases — supporting his co-appellants’ convictions as to count two. Because he was acquitted of "all wrong-doing related to the drug [distribution] conspiracy,” and because the government failed to produce other evidence showing a violation of citizens’ rights, Ruperto argues that his conviction under count one cannot stand.
These arguments were incorporated into appellants’ overall sufficiency of the evidence challenges to their count one convictions, which we reject for the reasons stated herein. Regarding Domínguez and Ruperto’s "following orders” defense, we reject the validity of a so-called Nuremberg defense. Cf. Judgment of the Tribunal, Trial of Wilhelm von Leeb and Thirteen Others, 12 Law Reports of Trials of War Criminals 1, 71-72 (United States War Crimes Commission 1949) (noting ”[t]he fact that any person acted pursuant to the order of his Government or of a superior does not free him from responsibility for a crime”).

. See supra Part I.A.

. See supra Part I.A.

. As previously discussed in the review of count one, to prove a conspiracy the government must show “the existence of a conspiracy, the defendant’s knowledge of the conspiracy, and the defendant’s voluntary participation in the conspiracy,” Gómez-Pabón, 911 F.2d at 852, with "voluntary participation” constituting an "intent to agree *17 to the conspiracy and [an] intent to effectuate the object of the conspiracy,” United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004). The defendant’s voluntary participation may be proved either by direct or circumstantial evidence. See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989).

. This statutory definition is consistent with the ordinary meaning of "distribution,” which is defined as "[t]he act or process of apportioning or giving out.” Black's Law Dictionary 543 (9th ed.2009).

. The legislative history states that the registration provisions were designed to "provid[e] for a 'closed' system of drug distribution for legitimate handlers of such drugs,” H.R.Rep. No. 91-1444 (1970), reprinted in 1970 U.S.C.C.A.N. 4566, 4571-72, and to enable the Department of Justice "to keep track of all drugs subject to abuse manufactured or distributed in the United States in order to prevent diversion of these drugs from legitimate channels of commerce,” id. at 4589. See also Gonzales v. Raich, 545 U.S. 1, 13, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) ("Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.”). The legislative history states that "all persons engaged in the legitimate distribution chain involving drugs included in one of the schedules under the bill must be registered with the Attorney General." H.R.Rep. No. 91-1444 (1970), reprinted in 1970 U.S.C.C.A.N. 4566, 4589 (emphasis added); see also 21 U.S.C. § 822(a)(1) (requiring "[ejvery person" who distributes controlled substances to register with the Attorney General (emphasis added)).

. Subchapter I of Title 21, Chapter 13 of the United States Code extends from 21 U.S.C. § 801 to § 904.

. The Supreme Court has been clear, in the entrapment context, that law enforcement officers may engage in undercover sting or reverse-sting operations to ensnare drug dealers. See United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); see also Hampton v. United States, 425 U.S. 484, 489-90, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (plurality opinion). We have likewise explained that “[i]t is incontrovertible that the government may supply drugs to a suspect in the course of a drug investigation.” United States v. Santana, 6 F.3d 1, 5 (1st Cir.1993) (collecting cases). These defendants do not fall within that category and do not argue that they do.

. The Attorney General has promulgated regulations exempting certain officials from registration requirements. See 21 C.F.R. § 1301.24 (entitled "Exemption of law enforcement officials”); see also id. § 1301.01 (explaining that this regulation applies to 21 U.S.C. §§ 821-824 and §§ 957-958). These regulations extend the protections of § 885(d) and waive the requirement of registration as to registered laboratories and their personnel, "when acting in the scope of their official duties.” Id. § 1301.24(c). These regulations also make clear that distribution of drugs between officials who are all "exempted by this section” and "acting in the course of [their] official duties" falls within the exemption. id. § 1301.24(b).

. Congress has emphasized the harm that unlawful conduct of law enforcement officers engaged in undercover activities can cause. A 1982 Senate Report noted, in the course of proposing reforms in response to the Abscam sting operation, that
[l]aw enforcement agents should not engage in serious and harmful criminal activity, or intentionally injure innocent third parties, in an attempt to deter crime. There is little doubt that the costs of such tactics — both to the target and to society — are likely to outweigh by a substantial amount the benefits gained through deterrence of crime.
S.Rep. No. 97-672, at 11 (1982) (citation omitted).

. Cf. United States v. Mack, 164 F.3d 467, 473 (9th Cir.1999) ("The special attributes of government agencies that justify their regulated possession of contraband are nowhere to be found in this set of disquieting facts...")

. The Attorney General has promulgated a set of Guidelines governing the FBI’s use of undercover operations that recognize that "use of undercover techniques ... is essential to the detection, prevention, and prosecution of ... offenses involving controlled substances,” but that "these techniques ... should be carefully considered and monitored.” Attorney General's Guidelines on FBI Undercover Operations § I (May 30, 2002), available at http://www.justice.gov/oig/special/ 0509/appendices.pdf. These Guidelines provide that "[e]xcept when authorized pursuant to these Guidelines, no undercover employee shall engage in any activity that would constitute a violation of Federal, state, or local law if engaged in by a private person acting without authorization.” Id. § IV.H. Illegal conduct may be engaged in "to obtain information or evidence necessary for the success of the investigation and not reasonably available without the participation in the otherwise illegal activity,” to establish or maintain cover, or to prevent death or serious bodily injury. Id. § IV.H(l). Undercover operations, including contemplated illegal activities, must be approved by the FBI Special Agent in Charge, including in circumstances involving "the controlled delivery of drugs which will not enter commerce.” Id. § IV.H(5)(a). The Guidelines require preparation for, as well as monitoring and periodic review of, all undercover operations, to guard against abuses. Id. § VI.

.See, e.g., United States v. Wright, 634 F.3d 770, 775-77 (5th Cir.2011) (rejecting defense under § 885(d) as to deputy sheriff found guilty of attempting to possess with the intent to distribute cocaine), cert. denied, - U.S. -, 132 S.Ct. 171, 181 L.Ed.2d 83 (2011); United States v. Sanchez-Berrios, 424 F.3d 65, 71-72 (1st Cir.2005) (affirming the convictions of three officers for conspiring to distribute over five kilograms of cocaine); United States v. Serrano-Beauvaix, 400 F.3d 50, 52 (1st Cir.2005) (affirming convictions of an officer and former officer for conspiracy to distribute over five kilograms of cocaine); United States v. Reeves, 730 F.2d 1189, 1195-96 (8th Cir.1984) (rejecting defense under § 885(d) as to sheriff and his deputy found guilty of conspiracy to distribute and distribution of marijuana).

. Even so, the evidence is that the officers did intend to introduce the drugs into society's illicit channels—the victims had to be in unlawful possession of the drags in order for the officers to achieve a "positive” result. Indeed, the evidence shows that the officers repeatedly transferred the drugs to known drug leaders and dealers, often leaving drugs somewhere on the drug dealer's property so that the drags would be "discovered” by other officers.
Further, the record would permit a jury to find that the drugs did not always or necessarily remain under the control of the planting officers. For example, at the home of Omayra Segarra, a/k/a "Puchi,” a known drug leader, Officer Velez left cocaine on a shelf in a closet. Velez testified that he thereafter left the closet, and that he did not know whether anyone found the cocaine planted in the closet.
The record also permits a finding that planted drugs were not always returned to the black box. Bosques testified that generally when he seized drugs, the drags were placed *24 in evidence envelopes and stored in his locker "for a few days” before he handed them in for processing.
Muñiz likewise testified that recovered drugs "must be deposited inside an envelope, an evidence envelope, and be stored in a locker we have for those purposes.” In order to successfully prosecute, the drugs would be used as evidence.

. Muñiz testified that he and Santiago discussed to which officers Santiago had distributed drugs for the purpose of fabricating arrests, and that the drugs were "distributed” during meetings at the office, while they were preparing documents before going out to make arrests. Vélez testified that before going out on arrest operations, they met in either Santiago’s or Muñiz's office to discuss “the work that was going to be done, the plan” as to the arrests. There were planning meetings before operations, where the planting of drugs was planned. Santiago and Muñiz would often, during the search operations, give instructions over the phone that the search had to result in an arrest.
Bosques testified about asking Cortés for heroin, to justify an arrest that he had made, and that Cortés provided him with the drugs. Vélez testified that Dominguez requested that Vélez provide him with drugs from the black *26 box, for the purpose of substantiating an arrest already made.

. On January 12, 2012, the district court reduced the sentence as to count two to 60 months' imprisonment, as was stipulated by the parties, in light of the retroactive changes to the sentencing guidelines promulgated in response to the Fair Sentencing Act of 2010. See United States v. Curet, 670 F.3d 296, 308-10 (1st Cir.2012) (discussing the Act and the retroactive changes to the guidelines), cert. denied, U.S. -, 132 S.Ct. 2728, 183 L.Ed.2d 80 (2012).

. One of these events involved Dominguez requesting two bags of crack cocaine from the black box, which Vélez provided to him, for use in substantiating an arrest. The second was an instance where an individual was arrested by Dominguez for possession of cocaine even though no cocaine was found.
In a separate event, in early July 2007, Dominguez provided Bosques with several bags of cocaine and marijuana.

. Neither party states to which count this enhancement was applied. Since we affirm the enhancement, we need not address the matter.

. On March 21, 2012, the district court reduced the sentence as to both counts to 78 months’ imprisonment, as was stipulated by the parties, in light of the retroactive changes to the sentencing guidelines promulgated in response to the Fair Sentencing Act of 2010.

. The term "U.S.S.G.” refers to the United States Sentencing Guidelines.

.Section 2J1.2 of the sentencing guidelines specifically applies to convictions for obstruction of justice, which are not at issue in this case. U.S.S.G. § 2J1.2. Section 2H1.1 applies to convictions for offenses involving individual rights. U.S.S.G. § 2H1.1.

. Perhaps one of the best known original sources of this phrase is from the comic book, Spider-Man. See Amazing Fantasy #15 (Marvel Comics, August 1962). It is also believed to have possibly originated with Voltaire. See Voltaire, et al., 48 Oeuvres de Voltaire (Lefèvre, 1840).