RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICHAEL WALLACE,

*Defendant-Appellant*.

┐
│
│
│
> No. 21-6011
│
│
│
┘

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:20-cr-00011-1—Robert E. Wier, District Judge.

Decided and Filed: October 12, 2022

Before: SUTTON, Chief Judge; BOGGS and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Amy Lee Copeland, ROUSE + COPELAND, LLC, Savannah, Georgia, for Appellant. Tovah R. Calderon, Natasha N. Babazadeh, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

SUTTON, C.J., delivered the opinion of the court in which BOGGS and KETHLEDGE, JJ., joined. SUTTON, C.J. (pp. 8–10), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge. Michael Wallace, a former Kentucky constable, lied on warrant applications, threatened suspects, kept distribution levels of methamphetamine in his house, and planted drug evidence to facilitate a pattern of false arrests. A jury convicted him of conspiring to violate the civil rights of several citizens and of possessing methamphetamine with intent to distribute it. Wallace challenges his drug conviction and sentence. We affirm.

I.

The people of Pulaski County, Kentucky, elected Wallace to serve as a constable, entrusting him with law enforcement authority equal to a sheriff's. Due to the limited resources available to constables, Wallace worked primarily out of his home and used funds seized during arrests to pay for expenses such as vehicle maintenance, new uniforms, and ammunition. The Somerset Police Department also provided equipment donations and permitted him to use the Department's evidence room to store items he had seized.

In 2018, Wallace pulled over Danny Hughes "for no apparent reason." R.213 at 224. After Wallace found some drugs on Hughes, he planted baggies and scales, elevating the potential charge from possession to distribution and enabling the seizure of Hughes's car.

Later that year, Wallace stopped Timothy Sizemore for expired tags and called in Somerset officers for backup. Wallace claimed that his K-9 had alerted for drugs, prompting the officers to search Sizemore's car. The officers thoroughly searched the car and failed to find any contraband. At that point, Wallace, who did not participate in the initial search, approached the car saying to his fellow officers, "watch this shit." *Id.* at 35–36. After briefly searching the vehicle, Wallace produced a pill bottle. When Sizemore objected that the bottle was not his, Wallace responded that, if Sizemore thought "we planted this on you," he would "take [Sizemore] back to the cruiser and kick [his] ass." *Id.* at 35–36, 95–96. In a subsequent search warrant, Wallace wrote that he had found "Percocet prescription tablets and suspected methamphetamine . . . under the driver's seat." R.214 at 71. Concerned about Wallace's purported discovery of methamphetamine in a vehicle that had already been carefully searched, the officers told a supervisor what happened, and he brought in the FBI.

The FBI started an undercover sting operation. An FBI informant contacted Wallace through a drug tip line and reported that a "black guy" driving a "black truck" at the Somerset Mall might be trafficking methamphetamine. R.213 at 110. In accord with the planted tip, an FBI task force officer posing as "Kareem Pinkney" parked at the Somerset Mall with $11,000 in his front pocket. *Id.* at 131. Wallace and another constable arrived at the mall and immediately pulled Pinkney from his truck, searched his pockets, and looked through his phone. Claiming that his K-9 had alerted for drugs, Wallace also searched Pinkney's truck. Pinkney passed field

sobriety tests administered by a Burnside police officer. The officer told Wallace he was not going to arrest Pinkney because there "wasn't much there." *Id.* at 208. Wallace nevertheless arrested Pinkney for public intoxication and booked him into jail, where he remained until the FBI secured his release.

In late 2019, Kayla Dobbs was returning to Pulaski County along with three friends after a night on the town in Lexington. The fun ceased when the designated driver pulled to the side of the road to clean a passenger's vomit. Wallace pulled up behind the car and ordered the intoxicated Dobbs to drive it to a nearby parking lot. Dobbs protested, saying she had been drinking. Wallace told her to drive the car anyway and said she would not "get in trouble." R.214 at 20. As soon as Dobbs started the car, however, Wallace activated his lights and pulled her over. Wallace removed her from the car, told her that "we can make all of this go away," and "stuck his hand up [her] skirt and felt [her] butt." *Id.* at 24, 27. Relying on a purported alert from his ever-reliable K-9, Wallace searched the car. He did not find any contraband, but proceeded to arrest Dobbs for DUI.

In early 2020, FBI agents confronted Wallace. He denied having any controlled substances in his home but consented to a search. When asked about his safe, Wallace stated "[t]here's nothing in there." R.215 at 117. The tangled web began to unravel when agents found 5.9 grams of methamphetamine in the safe, as well as nearly 30 firearms around the property.

A grand jury charged Wallace with conspiracy to violate civil rights, 18 U.S.C. § 241, and possession of methamphetamine with intent to distribute it, 21 U.S.C. § 841(a)(1). A jury convicted on both counts.

The pre-sentence report recommended a two-level enhancement for Wallace's possession of a dangerous weapon during a drug trafficking crime. U.S.S.G. § 2D1.1(b)(1). Wallace objected, claiming that his possession of firearms during his law enforcement duties was unconnected to his drug conviction. The court found that Wallace possessed an "arsenal of firearms" at his home alongside the methamphetamine, that Wallace was armed when he pretended to find a pill bottle containing drugs in Sizemore's car, and that the guns were connected to his crime through their power to intimidate the victims on whom he planted

evidence. R.206 at 20. The enhancement led to an advisory Guidelines range of 188 to 235 months.

In selecting an appropriate sentence, the court emphasized that Wallace refused to take responsibility for his crimes, targeted victims on the "low[est] rung" of society, and engaged in a pattern of dishonesty and "stomach-turning" abuse of his office. *Id.* at 80, 82. The court nonetheless varied downward from the bottom of the Guidelines range and imposed a sentence of 140 months. The court concluded that "importing the full weight of that meth" would overstate Wallace's culpability given the Guidelines' focus on the harm done by methamphetamine to users, not the harm from planting it to secure false arrests. *Id.* at 88.

On appeal, Wallace challenges the sufficiency of the evidence supporting his drug conviction and the dangerous weapon enhancement supporting his sentence.

II.

A.

*Sufficiency of the evidence*. To convict Wallace for the drug offense, the government had to establish that he knowingly possessed methamphetamine with intent to distribute it. 21 U.S.C. § 841(a)(1). In assessing a sufficiency challenge, we ask whether, after construing all evidence in favor of the verdict, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Wallace does not contest that he knowingly possessed methamphetamine. Nor does he challenge the jury instruction that "possession of controlled substances by a law enforcement officer for the purpose of planting those substances on others is possession with intent to distribute." R.216 at 94; *see United States v. Cortes-Caban*, 691 F.3d 1, 17–23 (1st Cir. 2012) (holding that planting drugs constitutes distribution); *United States v. Figueroa*, 729 F.3d 267, 273–75 (3d Cir. 2013) (same). The only pertinent question under Wallace's framing of the appeal is whether a rational jury could find that he possessed this methamphetamine for the purpose of planting it.

Ample evidence supports the jury's verdict. Wallace's attempt to frame Sizemore—with a pill bottle "found" in Sizemore's car—demonstrated a willingness to use fabricated drug

evidence to secure false arrests. By planting baggies and scales on Hughes, Wallace manufactured a trafficking charge, and the seizure of Hughes's vehicle confirmed this practice. While the other encounters—the Pinkney and Dobbs seizures—did not involve planted evidence, they confirmed Wallace's pattern and method of making false arrests. In the light cast by this pattern, Wallace's decision to store methamphetamine at home—instead of in the Somerset evidence lockup that he and other officers routinely used for other seized items—indicated a desire to have the drugs readily available to plant. On top of that, Wallace's serial false denials to the FBI about storing controlled substances in his home suggested consciousness of guilt. A reasonable jury could infer an intention to plant these drugs from this evidence.

Wallace advances two counterarguments. He now claims that rather than *planting* drugs during the Sizemore stop, he merely *pretended to find* drugs. Because the drugs never left his possession, he says, no "distribution" occurred. But because Wallace did not testify, the only evidence to support this theory is the speed with which he found the drugs in Sizemore's car. That speed, sure enough, permits the inference that the drugs never left his hands. But another equally legitimate (and less self-serving) possibility is that he immediately placed them there, searched around, then "found" them. Notably, the second possibility is what he said happened in preparing a warrant affidavit after the search: that he had found "Percocet prescription tablets and suspected methamphetamine . . . under the driver's seat." R.214 at 71. Making matters worse, Wallace did not raise this argument to the jury or the trial judge. The evidentiary record simply does not support Wallace's new argument.

But this wispy distinction does not solve Wallace's problem anyway. Possession with intent to distribute is a forward-looking offense. It does not require evidence of a track record of past distributions or even one distribution. *See United States v. Gardner*, 32 F.4th 504, 533 (6th Cir. 2022). Even if we accepted the idea that Wallace did not actually distribute drugs during the Sizemore stop—say because the methamphetamine never left his hands—his actions permitted the inference that he planned to continue framing the citizens of Pulaski County for methamphetamine possession.

Confirming the point is an earlier seizure. We know that his alleged failure to actually plant drugs in one car does not demonstrate the lack of an intent to do so in the future. When unaccompanied by potential witnesses during the Hughes stop, Wallace did *plant* baggies and a

scale to justify a trafficking charge and the seizure of the victim's car. Under the watchful gaze of the three Somerset officers present during the Sizemore stop, Wallace had no similar opportunity. He was instead forced to rely on the unconvincing ruse of pretending to find methamphetamine in Sizemore's previously searched car. His alleged inability to plant evidence on one occasion did not require the jury to conclude that, during his future attempts to secure false convictions, he would be unable to do so.

Wallace separately emphasizes that the agents found the methamphetamine bagged inside his safe, suggesting it was lawfully stored for law enforcement purposes. But this ford is easy to cross after a jury trial. It is the rare trial defendant who does not offer innocent explanations for their conduct. Sometimes juries accept those explanations. Sometimes they do not. Where the jury rejects the explanations, we generally let the jury make the call when the point is contested with admissible evidence. *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013). Just so here. The government and Wallace put on competing evidence about what Wallace was doing. Faced with extensive testimony about Wallace's corruption, the jury could reasonably reject this explanation. Circumstantial evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). That Wallace stored the drugs in evidence bags did not require the jury to accept his claim that he never intended to plant them.

B.

*Weapon enhancement*. Wallace contests the two-level sentencing enhancement for possessing a dangerous weapon during a drug trafficking crime. *See* U.S.S.G. § 2D1.1(b)(1). If a weapon was present during relevant conduct, the enhancement applies unless the defendant establishes a clear improbability that the weapon was connected to the offense. *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012); U.S.S.G. § 2D1.1 cmt. n.11(A). We review the district court's factfinding for clear error and "accord due deference to the district court's determination" that an enhancement applies. *United States v. Shanklin*, 924 F.3d 905, 919 (6th Cir. 2019).

The court did not clearly err in finding that firearms were present during Wallace's drug offense. Wallace kept dozens of guns at his home, including some just a few feet away from the

safe in which the drugs were found.  And Wallace admits to carrying a gun during his law enforcement duties.

Nor did Wallace establish that his guns were clearly unconnected to the offense.  In upholding the enhancement's applicability, we have emphasized the link between an officer's gun and the office abused to implement his criminal scheme, the gun's role in bolstering confidence, and its potential to frighten and intimidate victims.  *United States v. Sivils*, 960 F.2d 587, 596 (6th Cir. 1992).  Using similar logic, the district court recognized that, "if somebody is planting drugs on you, and threatening you if you call him on it, and he's got a gun on his hip, that's undoubtedly a factor in the overall crime."  R.206 at 22.  The link between Wallace's guns and his ability to possess and plant methamphetamine with perceived impunity undermines any contention that his guns were unconnected to his drug offense.  Plus, it would be strange for us to say, as we frequently do, that guns facilitate run-of-the-mine crimes by traditional drug distributors yet for us to be unwilling to follow the same logic when the shoe is on the other foot—when guns are used to facilitate atypical crimes by law enforcement officers bent on planting drugs on unsuspecting citizens.

Wallace, true enough, carried a gun as part of his law enforcement duties, creating potential overlap between the weapon enhancement and the unchallenged enhancement for committing the offense "under color of law."  *See* U.S.S.G. § 2H1.1(b)(1).  But each enhancement targets different conduct and penalizes distinct harms, eliminating the alleged double counting.  *See United States v. Nunley*, 29 F.4th 824, 830 (6th Cir. 2022).  Corrupt public officials do not necessarily carry dangerous weapons.  And it is the rare armed drug offender who acts under color of law.  No double-counting problem occurred.  *See Sivils*, 960 F.2d at 599.

We affirm.

————————

**CONCURRENCE**

————————

SUTTON, Chief Judge, concurring. While the evidence supports the jury's conviction, I must acknowledge some uncertainty about the statute's application to planting. In this instance, the court instructed the jury that planting drugs counts as distributing them, and Wallace does not object to that instruction on appeal, to this interpretation of the statute, or to the decisions of two courts of appeals that support this interpretation. *See United States v. Cortes-Caban*, 691 F.3d 1, 17–23 (1st Cir. 2012); *United States v. Figueroa*, 729 F.3d 267, 273–75 (3d Cir. 2013). But this conclusion is not beyond challenge.

On one side of the ledger, as our colleagues from the First and Third Circuits have fairly recognized, the statute is broadly written. The Controlled Substances Act defines "distribute" as "to deliver," 21 U.S.C. § 802(11), and defines "deliver" as "the actual, constructive, or attempted transfer" of drugs, *id.* § 802(8). One then could reasonably say that a "transfer" includes "to carry or take from one person or place to another," "to move or send to a different location," *Cortes-Caban*, 691 F.3d at 17 (quotations omitted), or "every method . . . of disposing of or parting with property," *United States v. McKenzie*, 743 F. App'x 1, 3 (7th Cir. 2018) (quotations omitted). An officer must generally move and dispose of drugs to plant them. *Cortes-Caban*, 691 F.3d at 18. Construed broadly, a transfer does not require a recipient to take possession of the drugs, making it irrelevant that the victim never touches the drugs and remains oblivious to their existence. *Cf. McKenzie*, 743 F. App'x at 2–3 (concluding that a distribution does not require a recipient to take possession). Or a transfer could occur in a different way. One officer might plant the drugs and a second officer could find them during a lawful search.

The statute's narrow exemption for officers who "lawfully engaged" in drug enforcement also suggests a broad definition of distribution, as the legislature saw it necessary to carve out such legitimate law enforcement activity. *Cortes-Caban*, 691 F.3d at 20–22 (citing 21 U.S.C. § 885(d)). The exemption suggests that "transfer" is broad enough to sweep in ordinary law enforcement conduct (say a sting operation or an arresting officer transferring the drugs to a custodian). In the context of a protected sting and its unprotected illegitimate sibling—

planting—officers intend to reclaim the drugs, and yet the carveout suggests the statute facially covers both types of temporary transfers—absent an exemption.

On the other side of the ledger, the meaning of an elastic word such as "transfer" "cannot be determined in isolation, but must be drawn from the context in which it is used." *Smith v. United States*, 508 U.S. 223, 241–42 (1993) (Scalia, J., dissenting) (quotations omitted). The key distinction is between how a word "*can* be used and how it *ordinarily is* used." *Id.* at 242. That is particularly so in the context of penal laws, where ambiguity favors the defendant. *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). Congress made clear that the purpose of our drugs laws, as opposed to our civil rights laws, is to target the "detrimental effect [of drugs] on the *health* and general welfare of the American people." 21 U.S.C. § 801(2) (emphasis added). In other circumstances, items may be transferred from place to place, but this context calls for a definition of "transfer" focused on the conveyance "from one person . . . to another." *Transfer*, Webster's Third New International Dictionary 2427 (2002). In other words, a prohibited "transfer" *of drugs* requires both a transferor and a transferee, because drugs can do little harm without a recipient. In this context, speaking of temporarily "transferring" drugs by planting them seems as strange as "using" a cane by hanging it in the hall. *See Smith*, 508 U.S. at 242 (Scalia, J., dissenting).

The statutory distinction between distribution and simple possession also lends support to a more limited reading of "transfer," one that requires an intended conveyance between two parties. *Compare* 21 U.S.C. § 841(a) (distribution), *with id.* § 844(a) (possession). If merely "carry[ing] or tak[ing] [drugs] from one . . . place to another," "mov[ing] [drugs] . . . to a different location," or "disposing of" drugs constitute a transfer, *Cortes-Caban*, 691 F.3d at 17 (quotations omitted), the line between possession and distribution starts to vanish. Addicts invariably move their drugs between the moment of purchase and the moment of consumption. Yet few would say that a drug user is engaged in a distribution when he "moves" drugs from his right pocket to his left or returns home with drugs after a purchase. If merely "disposing of" drugs counts as a distribution, moreover, that would convert a possession crime into a distribution crime when a defendant flushes drugs down a toilet or throws them into a lake while fleeing the police. *Cortes-Caban*, 691 F.3d at 17. So too of a drug user who hides drugs in his neighbor's garage for the purpose of retrieving them later.

Nor, from the government's perspective, is it clear what law-enforcement end is served by this broad interpretation of the drug distribution laws. No one contests that the planting of drugs is punishable as a violation of the victim's civil rights, as Wallace well knows. *See* 18 U.S.C. §§ 241, 242. A district court's broad authority to vary upward under the Sentencing Guidelines leaves plenty of room to ensure wayward officers get what they deserve. The worse the conduct after all, the more room for an enhanced sentence. Judge Wier, notably, took account of this dynamic in the other direction in lowering Wallace's sentence to account for the reality that this was not a conventional application of the drug distribution laws.

Both sides of this ledger may warrant careful examination if the government opts to seek further convictions under this broad interpretation of the drug distribution laws. For now, I take the case as it comes to us. A final balancing of the books on this score must await another day.