RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ERIC LAVELL MINTER,

*Defendant-Appellant*.

No. 22-5600

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:17-cr-00010-5—David L. Bunning, District Judge.

Argued: August 2, 2023

Decided and Filed: August 31, 2023

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Maryam Assar, CASE WESTERN RESERVE UNIVERSITY, Cleveland, Ohio, for Appellant. John Patrick Grant, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Maryam Assar, Andrew S. Pollis, CASE WESTERN RESERVE UNIVERSITY, Cleveland, Ohio, for Appellant. John Patrick Grant, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge. Eric Minter pleaded guilty to conspiracy to distribute heroin. He appeals the district court's enhancements of his sentence for acting as a manager or supervisor of the conspiracy and for constructive possession of a firearm. For reasons discussed below, we hold that both enhancements were proper and AFFIRM the district court's sentence.

**I.**

On August 28, 2017, the Ohio State Highway Patrol seized four vacuum-sealed packages during a routine traffic stop of two drug couriers, Kimberly Moore and James Saunders. Field testing revealed the packages contained around 431 grams of heroin. Following the positive field test results, officers arrested the couriers. They told police they had planned to deliver their load to Minter in Huntington, West Virginia.

Instead, law enforcement took the couriers to the police station, where the FBI Drug Task Force took over the investigation. Interviews revealed that Moore and Saunders were returning from making a cash delivery to, and heroin pickup from, Leonard Wright in Detroit, Michigan. A search of the couriers' cell phones revealed Minter had paid them in either cash or drugs, or both, to deliver the money to Wright and return with drugs. After delivery of the heroin to Minter, the plan was for him to distribute it.

On the same day that Moore and Saunders were arrested and questioned, members of the FBI Drug Task Force followed up by obtaining and executing a search warrant for Minter's residence. There they recovered traces of heroin, scales, and about $18,000 in cash. As a result, Minter was arrested and charged with state offenses related to conspiracy to traffic in drugs.

Moore and Saunders revealed in their interviews with detectives that they had made similar journeys between Wright and Minter in the past. According to Moore, Minter introduced her to Wright during an earlier delivery trip. Moore explained that Wright was "in charge," as the main leader of the operation, and that he set the amount she and Saunders were paid. As for Minter's role, according to Moore, he told her and Saunders where and when to give him the drugs in Huntington, paid them for the deliveries, and gave them cash to take to Wright.

On the day after Minter's arrest, August 29, 2017, members of the FBI Drug Task Force executed a second narcotics search warrant, based on information from a confidential informant, to search under the porch of Minter's residence. Minter lived in an apartment on the upper floor of the building, and he shared the downstairs porch with other tenants. During this search, officers recovered a large charcoal bag containing 529 grams of heroin and 37 grams of crack cocaine. Underneath the steps of the porch, officers also recovered a stolen .357 Magnum

revolver. The revolver was hidden in a plastic grocery bag about eight feet from the bag containing the drugs.

Law enforcement never tested the gun for Minter's DNA or fingerprints. Also, Moore testified that she had never seen Minter with a gun in person. She did, however, recall him and Wright "playing" with a gun during a FaceTime video call, though she could not recall further details.

Other calls relevant to the case occurred between Minter and his girlfriend, Erica Miller, while he was in jail. In one call, he told her to "make sure that nobody got behind [the house]." The next day Minter called Miller again, telling her to make sure nobody walked around to the back of the house. Miller then informed Minter that the police had found a revolver and "a bag with a bunch of other stuff" under the porch. Minter replied, "[O]h my God, Erica, it's over with, because if they found that s***, oh, my God, Erica, . . . I need you to go back and look underneath there." In response, Miller reminded Minter that the phone call was being recorded, and Minter began to cry.

Despite Miller's warning of their calls being recorded, Minter in a subsequent call told his girlfriend to check underneath the porch, where there should be a "big-a** charcoal bag." Miller reported that no such bag was under the porch. Minter then told her to "check by the steps. You have to move the grass to look."

Minter pleaded guilty to conspiring to distribute heroin in September 2018, and the district court sentenced him as a career offender. This court vacated that sentence after the government conceded that Minter no longer qualified as a career offender following this court's decision in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (per curiam). On remand, the district court applied a three-level enhancement for an aggravating role in an offense involving five participants and a two-level enhancement for firearm possession during drug trafficking. Minter appealed a second time, and this court again vacated his sentence because the offense involved only four known participants. On the second remand, the district court applied a two-level enhancement for his role as a manager or supervisor and the same two-level firearm-possession enhancement.

Now, Minter appeals the second resentencing order, arguing that he was not a manager or supervisor in the conspiracy and that he did not constructively possess the revolver found under the porch.

**II.**

This court reviews criminal sentences "under a deferential abuse-of-discretion standard for reasonableness." *United States v. Seymour*, 592 F. App'x 482, 482 (6th Cir. 2015) (per curiam) (citing *United States v. Studabaker*, 578 F.3d 423, 430 (6th Cir. 2009)). In assessing procedural reasonableness, the court's analysis "includes determining whether the district court properly calculated a defendant's Guidelines range." *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). "As for the calculation of the Guidelines range, this court reviews the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Hills*, 27 F.4th 1155, 1193 (6th Cir. 2022) (citing *United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020)).

**III.**

**A. Managerial-Role Enhancement**

The district court did not err in imposing a managerial-role sentence enhancement. Although Minter was not the ultimate leader of the drug-trafficking operation, he is still subject to a managerial enhancement under the facts of this case. That is because the evidence included support for the district court's findings that he (1) coordinated meetings to exchange wholesale shipments of heroin for delivery fees and (2) received a larger share of the profits of the drug conspiracy than Moore and Saunders.

A two-level managerial-role sentencing enhancement applies when a defendant "was an organizer, leader, manager, or supervisor in any criminal activity" involving four or fewer participants that was not otherwise extensive in its scope. U.S.S.G. § 3B1.1(c). Generally, "a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (quoting *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997)).

"Merely playing an essential role in the offense is not equivalent to exercising managerial control over other participants." *Id.* (citing *United States v. Albers*, 93 F.3d 1469, 1487 (10th Cir. 1996)).

Factors relevant to a leadership enhancement include if the defendant "exercised decisionmaking authority, recruited accomplices, *received a larger share of the profits*, was instrumental in the planning phase of the criminal venture, or *exercised control or authority over at least one accomplice*." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (emphasis added) (citing *United States v. Lalonde*, 509 F.3d 750, 765–66 (6th Cir. 2007)). Importantly, "[a] district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012) (citing *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)). And "[t]he government bears the burden of proving that the enhancement applies by a preponderance of the evidence." *Vandeberg*, 201 F.3d at 811 (citing *United States v. Martinez*, 181 F.3d 794, 797 (6th Cir. 1999)). But we review a district court's decision to grant a leadership enhancement under § 3B1.1 deferentially because it raises a "fact-intensive" question. *See United States v.* Washington, 715 F.3d 975, 983 (6th Cir. 2013); *United States v. Warren*, 2023 WL 1961222, at *3 (6th Cir. Feb. 13, 2023) (citing cases).

Moore testified that Wright oversaw the conspiracy, but her testimony also implicated Minter as a manager in the scheme. Minter told her where and when to meet him to deliver the drugs and pick up the cash so that she and Saunders could bring the money to Wright in Detroit. Minter provided directions to Moore by coordinating the locations for her to retrieve the cash to transport to Detroit. And Minter was responsible for paying Moore and Saunders for their trips between Detroit and Huntington, which confirms some management or supervision. This court has held that a district court's finding that a defendant repeatedly directed a drug courier to coordinate delivery can sustain application of the § 3B1.1 enhancement. *See, e.g.*, *United States v. Munoz*, 233 F.3d 410, 416 (6th Cir. 2000); *United States v. Gaitan-Acevedo*, 148 F.3d 577, 595–96 (6th Cir. 1998).

Yet the exercise of control over a conspiracy's "property, assets, or activities" does not alone warrant a sentencing enhancement, so Minter's coordination of the location for the drug buys and provision of cash for the drugs, without more, do not support a managerial-role

enhancement.  *Gort-Didonato*, 109 F.3d at 321.  If Minter had only participated in a purely buyer-seller relationship with Moore and Saunders, then he would not necessarily have exercised control over them and would not be subject to an enhancement.  *See United States v. Swanberg*, 370 F.3d 622, 629 (6th Cir. 2004) (explaining that selling drugs to multiple individuals did not allow for a leadership enhancement under U.S.S.G. § 3B1.1 because that is only exercising control over the property, assets, or activities of the enterprise).

This conclusion aligns with the holding of this court from Minter's second appeal. Before that appeal, the district court "reasoned that Minter must be distributing the heroin he received," so the district court "determined this individual who received drugs as part of the conspiracy qualified as a criminal participant for purposes of § 3B1.1."  *United States v. Minter*, No. 20-6379, at 3 (6th Cir. Sep. 9, 2021) (order) (cleaned up).  This court disagreed, reasoning that a sale to an end user of the drugs did not, standing alone, make the end user a participant in the conspiracy.  *Id.* at 4; *see United States v. Wheeler*, 67 F. App'x 296, 304 (6th Cir. 2003).

Most of our sister circuits have also held that an arm's length seller-buyer relationship cannot lead to a managerial enhancement under § 3B1.1.  *See, e.g.*, *United States v. Lora-Andres*, 844 F.3d 781, 785–86 (8th Cir. 2016); *United States v. Hussein*, 664 F.3d 155, 162 (7th Cir. 2011); *United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000); *United States v. Baez-Acuna*, 54 F.3d 634, 639 (10th Cir. 1995); *United States v. Olivier-Diaz*, 13 F.3d 1, 5 (1st Cir. 1993); *United States v. Carbajal-Gonzalez*, 661 F. App'x. 825, 827 (5th Cir. 2016); *United States v. Baker*, 539 F. App'x. 299, 304–05 (4th Cir. 2013); *United States v. Duran*, 528 F. App'x. 215, 220–21 (3d Cir. 2013).  *But see United States v. Zepeta*, 389 F. App'x. 907, 910 (11th Cir. 2010) (holding that an individual buyer could be considered a participant).

Yet several facts demonstrate that Minter's relationship with Moore and Saunders was not merely that of a buyer and seller.  For one thing, Minter paid them a delivery fee rather than the value of the drugs.  He also dictated the details of their exchanges as the "buyer," whereas in most drug deals, the seller does so.  In addition, he had consistent, repeated contact with the couriers throughout the conspiracy, and he introduced Moore to Wright, another member of the same conspiracy.

Most significant here, Minter benefited financially from the operation more than either Moore or Saunders. Minter's retention of most of the proceeds, while paying another conspirator only a delivery fee, supports a § 3B1.1 enhancement. *See United States v. Plunk*, 415 F. App'x 650, 653 (6th Cir. 2011).

Minter's contention that he did not claim a larger share of the fruits of the crime is tenuous. Moore and Saunders were paid only $1,500 for transporting the drugs between Detroit and Huntington. That is a small sum when compared to the amount of money the pair transported from Minter to Wright, between $15,000 and $30,000. It is only a fraction of the proceeds in light of the value of the large volume of heroin transported from Wright to Minter—around 400 grams worth about $100 per gram (amounting to about $40,000 per trip).

Moore testified that she did not think that she and Saunders were being paid the full amount of money that the drugs were sold for and that Minter and Wright likely received a larger share. The district court correctly observed that "as a local distributor in Huntington, [Minter] was going to profit much more than Moore or Saunders who were mere couriers." At a minimum, that factual finding by the district court is not clearly erroneous because of the discrepancy between the delivery fees paid and the money likely generated through the distribution of the heroin in Huntington. Minter was the only conspirator in Huntington, so he did not equally split any profits with another conspirator there. While Wright may have also received a larger share of the profits than Moore or Saunders, Minter would have as well.

Again, "[a] district court need not find each factor in order to warrant an enhancement." *Castilla-Lugo*, 699 F.3d at 460. Here, the record provided enough evidentiary support for the district court to reasonably conclude that Minter not only exercised authority over an accomplice but also received a larger share of the drug-trafficking profits than that accomplice. Thus, the record supported a finding that Minter exercised at least some level of managerial control over Moore and Saunders. Thus, especially given our deferential standard of review, the district court did not err in imposing the managerial-role sentence enhancement.

**B. Firearm-Possession Enhancement**

We also find no error in the district court's imposition of the firearm-possession enhancement.[1] Minter's statements made in the jail calls with his girlfriend support the district court's findings that he knew the pistol was hidden beneath the porch and that he constructively possessed the firearm.

A two-level sentence enhancement under U.S.S.G. § 2D1.1(b)(1) "applies when the government establishes by a preponderance of the evidence that (1) the defendant actually or constructively possessed the dangerous weapon (2) during the offense." *United States v. Mosley*, 53 F.4th 947, 966 (6th Cir. 2022) (citing *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020)). Further, "[i]f a weapon was present during relevant conduct, the enhancement applies unless the defendant establishes a clear improbability that the weapon was connected to the offense." *United States v. Wallace*, 51 F.4th 177, 183 (6th Cir. 2022).

"[A] defendant is in constructive possession of a weapon if he has 'ownership, or dominion or control over the item itself, or dominion over the premises where the item is located.'" *United States v. Ayoub*, 701 F. App'x 427, 447 (6th Cir. 2017) (quoting *United States v. Wheaton*, 517 F.3d 350, 367) (6th Cir. 2008)). Constructive possession occurs "when a person does not have actual possession but instead *knowingly* has the power and the *intention* . . . to exercise dominion and control over [the] object, either directly or through others." *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (citation omitted).

Notably, the revolver was recovered under the steps of a shared porch that was not in the exclusive possession of Minter. "[W]here the defendant is in nonexclusive possession of premises on which [illicit contraband] [is] found, it cannot be inferred that he knew of the presence of such [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." *Id.* at 944 n.3 (alterations in

---

[1]On his second appeal after the first remand, Minter challenged the managerial-role enhancement but did not raise the firearm-possession enhancement issue. Generally, this would constitute a forfeiture of the issue in later appeals. *See United States v. Gibbs*, 626 F.3d 344, 351 (6th Cir. 2010). Yet the United States did not contend that Minter forfeited that argument. Thus, the "government forfeited the forfeiture." *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013) (citing *United States v. Turner*, 602 F.3d 778, 783 (6th Cir. 2010)).

original) (citation omitted).  In *United States v. Crumpton*, 824 F.3d 593 (6th Cir. 2016), this court held that a finding of constructive possession was warranted when the defendant's "affiliation with and control over the front area of the [multi-family residence where he lived], [was] combined with his statement regarding his involvement in placing the ammunition in the house and holding it for someone else." *Id.* at 609.

Here, Minter's statements were similar to Crumpton's, thus supporting the finding of constructive possession.  Although Minter did not explicitly mention the revolver in his jail phone calls to Miller, the district court did not clearly err in finding that he was referring to that firearm.

Again, to recount the relevant facts, after his arrest Minter called Miller and told her to "make sure that nobody got behind [the house]."  In a later call, Miller told Minter that police had found a revolver and a bag of drugs under the porch.  Minter replied, "[O]h my God, Erica, it's over with, because if they found that s*** . . . ."  After Miller reminded Minter that the phone call was being recorded, Minter began to cry.  Later, Minter told Miller to look underneath the porch.  He first told her that there should be a "big-a** charcoal bag."  Miller told Minter that there were not any bags under the porch.  Minter then told her, as Detective Chris Kirk testified: "[C]heck by the steps.  You have to move the grass to look."  This was the exact place where the revolver had been discovered.

Minter had no reason to tell Miller specifically to "check by the steps" aside from directing her to look for the revolver.  Minter argues that the most reasonable inference from his statements is that he was merely concerned that police had found the bag of drugs.  At the same time, Minter also claims that he "had no reason to pay attention to the contents of a grocery bag under his neighbor's stairs."  In making that argument, Minter attempts to distinguish between the area of the porch where law enforcement found the bag with the drugs and the area where they found the bag containing the pistol.  But Minter's claims are inconsistent.  It cannot be true that he had no reason to concern himself with the area under the porch where the weapon was stored because he expressed concern to Miller about checking by the steps, which were eight feet away from his bag of heroin and exactly where the weapon was found.

Further, Minter's admission that he hid heroin under the porch establishes that he used the space as a hiding spot for illicit items. This affiliation with the area bolsters the district court's reasonable finding that Minter constructively possessed the revolver. Though Minter shared the porch with other residents, his actions point to his "affiliation with and control over" the area beneath the porch to hide illegal materials. *Crumpton,* 824 F.3d at 609. Given that Minter already thought the porch a suitable hiding spot for his stash of heroin, it is a rational inference that Minter would have also used the porch to hide a stolen revolver. Thus, the district court did not err in applying the enhancement.

Minter suggests that the government's decision not to send the gun for fingerprint or DNA testing creates a glaring gap in the case against him, but his argument is unpersuasive. As this court reasoned in *United States v. Malone*, 308 F. App'x 949 (6th Cir. 2009), "'[t]he fact that no identifiable fingerprints were found on [a gun] is not determinative' as it has been explained that 'fingerprints are rarely identified on firearms.'" *Id.* at 953 (alterations in original) (quoting *United States v. Coffee,* 434 F.3d 887, 897 (6th Cir. 2006) (holding that the absence of fingerprints on either of two revolvers was not determinative where "there was sufficient evidence for a rational trier of fact to conclude that at the time of the search, defendant had dominion over the house where the firearms were located")).

Minter also argues that a defendant's previous possession of a gun alone cannot support a theory of constructive possession, arguing that Moore's testimony about Minter possibly possessing a gun in the past was not enough to support the enhancement. This court's decision in *United States v. Arnold*, 486 F.3d 177 (6th Cir. 2007) (en banc), lends credence to that argument by holding that if "the only evidence connecting the defendant to the gun (other than proximity) was that the defendant at some distant point in time and in some other place had possessed *a* gun," then the possession of the gun is too attenuated to be attributed to the defendant. *Id.* at 183. But Minter's constructive possession of the revolver was not attenuated here because the facts adequately support the district court's inference that Minter knew about the revolver's presence under the porch. Minter's own statements demonstrate his concern about the area under the porch—more specifically, the spot "by the steps" where the revolver was hidden—and his admitted use of the porch as a hiding space for illicit materials demonstrated

that Minter exercised control over the revolver apart from his control over the charcoal bag of heroin.

## IV.

For the foregoing reasons, we AFFIRM the district court's sentence.