NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0312n.06

Case No. 23-6079

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | **FILED** |
| | ) | Jul 18, 2024 |
| v. | ) | KELLY L. STEPHENS, Clerk |
| | ) | ON APPEAL FROM THE UNITED |
| KEVIN C. PEARCE, JR., | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
|     Defendant-Appellant. | ) | KENTUCKY |
| | ) | |
| | ) | OPINION |
| | ) | |

Before: GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** A jury convicted Kevin Pearce, a former federal corrections officer, on two counts of falsifying records. The district court sentenced him to 66 months' imprisonment. Pearce contends that his sentence is not procedurally reasonable. For the reasons below, we affirm.

## I.

Pearce served as the operations lieutenant at the United States Penitentiary Big Sandy in Inez, Kentucky, for about two years. In that role, Pearce had significant managerial and supervisory authority that included running the prison's day-to-day operations. The government alleged that, while Pearce was operations lieutenant, he and other officers committed several crimes in connection with assaults against two inmates at Big Sandy.

The first assault was against E.G in late March 2021. It involved officers Samuel Patrick, Jared Kelly, and Clinton Pauley. It also involved Pearce who, as operations lieutenant, was the ranking supervisor during this assault.

The assault against E.G. began with Patrick pepper spraying him. After that, Kelly pushed E.G. to the ground, and Pauley punched and "football kicked" him in the head. R. 160, PageID 1400–01. As E.G. lay on the ground, Pearce shot several "balls" of pepper spray at him using a "pepperball launcher." *Id.* at 1483. The abuse continued even after the officers had E.G. in handcuffs.

There was no evidence that E.G. acted aggressively, posed a threat, or failed to comply with the officers' orders before or during the assault. According to a former officer on the scene that day, the assault against E.G. was "shocking" and "one of the worst uses of force[]" he had ever witnessed. *Id.* at 1312. Nevertheless, the reports that came from Pearce and other officers stated that E.G. threatened violence and that they suspected E.G. had a weapon.

The government presented evidence that Pearce, Pauley, and Patrick agreed to try and cover up their assault on E.G. They did so by submitting false reports about E.G.'s assault. Indeed, all three reports stuck closely to the same false narrative. The government also alleged that Pearce pressured two of his subordinate officers—Kelly and Brent Ousley, another officer who witnessed E.G.'s assault—to join the cover-up scheme and author untruthful reports about this incident.

Ousley testified at trial that Pearce called him after E.G.'s assault. Ousley understood from their conversation that he was expected to report that E.G. "was being resistant and aggressive" because Pearce wanted him to corroborate "their cover story." *Id.* at 1616–17. He also understood that he needed to relay Pearce's directions to Kelly, who was sitting with Ousley when Pearce called. So Ousley complied, writing his false report and leaving it for Kelly to use. He testified

that he submitted a false report because he feared prison staff, including Pearce, would retaliate against him.

A second assault, this time against C.T., another inmate at Big Sandy, happened in Pearce's office in late April 2021. Escorted to that office by Officer Anthony Carter, C.T. requested that prison officials place him in protective custody after receiving threats against his safety. Pearce, Patrick, Pauley, and others were in the office when C.T.'s request was denied. Upset, C.T. continued to explain why he sought protective custody.

Although C.T. did not pose a threat or resist an order, Patrick and Pauley assaulted C.T. as others watched. They repeatedly struck C.T. in the head, thighs, and back while Patrick laid on top of him. They did so until Pearce said "[t]hat's enough." R. 159, PageID 1003.

After initially deciding not to report the incident involving C.T., Pearce and Patrick wrote reports that did not mention the assault. Nor did their reports mention Pauley's presence in the lieutenant's office at all. Instead, their reports stated that C.T. came to the office to make a request while Pearce, Patrick, and Carter were present. And, according to the government, Pearce unsuccessfully tried to convince Carter to write a similar report.

Pearce's report also stated that Ryan Elliott, a fellow lieutenant, was present at C.T.'s request. But that was not true. Still, Elliott submitted a report that corroborated Pearce and Patrick's version of events. The government alleged that Pearce pressured Elliott to do so. And the government presented evidence that Pearce "watched over [Elliott's] shoulder as [he] wrote his false report" and "instructed" him to include certain language to corroborate Pearce's report. R. 213-1, PageID 2534.

A grand jury indicted Pearce, Pauley, and Patrick for various offenses based on their alleged involvement in these two assaults. For E.G.'s assault, the indictment alleged that Pearce:

(1) deprived E.G. of his constitutional right to be free from cruel and unusual punishment, in violation of 18 U.S.C. § 242 (Count 8); (2) tampered with witnesses, namely Kelly and Ousley, in violation of 18 U.S.C. § 1512(b)(3) (Count 9); and (3) falsified records in federal investigations, in violation of 18 U.S.C. § 1519 (Count 12). For C.T.'s assault, the indictment alleged that Pearce: (1) tampered with a witness, here Carter, in violation of 18 U.S.C. § 1512(b)(3) (Count 2); and (2) falsified records in a federal investigation, in violation of 18 U.S.C. § 1519 (Count 3). Pearce proceeded to trial. After a five-day trial, the jury found Pearce guilty of Counts 3 and 12 for falsifying records but acquitted him on the remaining three counts.

At sentencing, the district court calculated Pearce's advisory Sentencing Guidelines range to be 57 to 71 months' imprisonment. Among other things, this range was based on a three-level sentence enhancement the district court applied for Pearce's role in the offenses under U.S.S.G. § 3B1.1(b). The district court also denied Pearce a two-level deduction that certain zero-point offenders are entitled to under § 4C1.1(a). The district court imposed an effective sentence of 66 months' imprisonment. This timely appeal followed.

## II.

On appeal, Pearce contends that his sentence is unreasonable. We review the reasonableness of a sentence under the "deferential abuse-of-discretion standard." *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013).

Pearce's overarching theory is that the district court improperly calculated his Guidelines range. He thus challenges the procedural reasonableness of his sentence. Significant procedural errors, "such as failing to calculate (or improperly calculating)" a defendant's Guidelines range, are "necessarily" an abuse of a district court's sentencing discretion. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

In determining the correctness of the district court's Guidelines calculation, we "review the district court's factual findings for clear error and its legal conclusions de novo." *Id.* (citation omitted). The district court's factual findings are not clearly erroneous unless the evidence leaves us "with the definite and firm conviction that the district court made a mistake." *United States v. Ellis*, 938 F.3d 757, 761 (6th Cir. 2019) (internal quotation marks omitted).

**III.**

Pearce argues that the district court erred by: (1) applying a three-level leadership enhancement under U.S.S.G. § 3B1.1(b), and (2) not applying a two-level reduction for zero-point offenders under U.S.S.G. § 4C1.1(a). We address each argument in turn.

**A.**

*Leadership enhancement*. We consider first the district court's application of U.S.S.G. § 3B1.1. This section instructs that a defendant's offense level should be increased "[b]ased on the defendant's role in the offense." U.S.S.G. § 3B1.1. Pertinent here, for a defendant who was "a manager or supervisor" of "criminal activity" that "involved five or more participants or was otherwise extensive," the Guidelines instruct district courts to increase the offense level by three. *Id.* § 3B1.1(b).

The district court found that Pearce was a "manager or supervisor" of the criminal activity. In reaching this conclusion, the district court considered the actions underlying Pearce's two false-record convictions and other "relevant conduct," as the Guidelines define that term. It found that the relevant conduct included concealment related to Pearce's underlying false-records offenses. That concealment involved Pearce pressuring his subordinates—including Ousley, Kelly, and Elliott—to participate in the cover-ups by submitting false reports about the assaults against E.G. and C.T.

And the district court found that the two offenses for which the jury returned guilty verdicts against Pearce involved at least five participants. The district court included the three codefendants—Pearce, Pauley, and Patrick—as participants in the criminal activity underlying both convictions. For Count 3, it found that Elliott and two other officers—Duff and Erwin—also participated in that offense. For Count 12, it found that Ousley and Kelly participated in that offense alongside the three codefendants.

The district court explained how Pearce used his authority as operations lieutenant to manage or supervise the cover-up scheme. The court found it "significant" that "day-to-day . . . Pearce had control and authority over just about everybody, excluding of course," the executive team above him—"the captain and the warden's office." R. 225, PageID 2758. Big Sandy's executive team had "significant involvement in designing a way to minimize accountability." *Id.* at 2759. The district court characterized that involvement as "heavy handed direction from the top" by officials not charged here who were "clearly above" Pearce. *Id.* at 2759–60. From this, the district court found that "the highest levels of the prison" developed and directed a cover-up scheme that "went directly through Pearce to be implemented through Pearce's subordinate[s]." *Id.* at 2760. And so, it found that Pearce used his "positional authority" at Big Sandy to strengthen cover-up efforts, but only via "management and supervision rather than organization and leadership." *Id.* at 2757, 2763.

The district court accordingly increased Pearce's offense level by three points. Reviewing the district court's application of U.S.S.G. § 3B1.1(b) deferentially, as we must, *see United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013), the district court did not err in applying the leadership enhancement. The district court's factual findings regarding Pearce's role in the underlying offenses were not clearly erroneous. Most of the facts supporting the enhancement

came from the trial evidence. That evidence showed that Pearce's offenses involved at least five participants and that Pearce used his role as the operations lieutenant at Big Sandy to manage, or supervise, the criminal activity. Although the jury acquitted Pearce of several of the charges against him, the district court could still rely on the trial evidence in making its factual findings at sentencing.

Pearce raises several counterarguments. None persuades us.

**1.**

Pearce argues that the district court erred by relying on acquitted or uncharged conduct to support the leadership enhancement. Our precedent forecloses this argument. We have held previously that district courts may rely on acquitted conduct in applying enhancements if the enhancements do not increase the defendant's sentence beyond the statutory maximum and the government proves the conduct underlying the enhancements by a preponderance of the evidence. *United States v. White*, 551 F.3d 381, 385–86 (6th Cir. 2008) (en banc); *see also United States v. Watts*, 519 U.S. 148, 156–57 (1997) (per curiam). District courts may rely on uncharged conduct as well under the same circumstances. *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003).

The U.S. Sentencing Commission has proposed an amendment that restricts the use of acquitted conduct at sentencing.[1] Pearce argues that we should at least remand his case "for resentencing and instruct the district court to take the Commission's new proposed amendment into consideration." D. 18 at p.8. But a remand would not help Pearce because the acquitted-conduct amendment has not yet been enacted, and district courts need only apply the Guidelines "in effect." 18 U.S.C. § 3553(a)(4)(A)(ii), (a)(5)(B); U.S.S.G. § 1B1.11(a).

---

[1] *See* U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines (Preliminary)* (Apr. 17, 2024), https://content.govdelivery.com/attachments/USSC/2024/04/17/file_attachments/2850131/202404_prelim-rf.pdf.

**2.**

Pearce argues that his pressuring others into submitting false reports was not "relevant conduct" to his false-records convictions. Relevant conduct includes:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and
>>
>> (iii) reasonably foreseeable in connection with that criminal activity;
>>
>> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1).

Courts may consider a defendant's relevant conduct when determining his role under § 3B1.1(b). *See id.* "[T]o qualify as 'relevant' conduct," Pearce's cover-up efforts "must have constituted a criminal violation that could result in incarceration[.]" *United States v. Hodge*, 805 F.3d 675, 680 (6th Cir. 2015). But "the conduct need not result in a conviction." *Id.* at 679 (citation omitted). Relevant conduct also requires "some logical relationship to the offense of conviction." *Id.* at 680.

It is illegal "to try and conceal a felony." *United States v. Hernandez*, 721 F. Appx. 479, 482 (6th Cir. 2018). As provided above, several officers testified that Pearce falsified his own reports and pressured his subordinates to stick to the same story to cover up the assaults against E.G. and C.T. This is a crime. *See Hodge*, 805 F.3d at 680. Pearce's attempts "to avoid detection or responsibility" for his own false reports is also logically related to his false-records convictions under § 1B1.3(a)(1)(A). *See id.* The district court therefore did not err by finding that Pearce's personal efforts to conceal the assaults at Big Sandy were relevant conduct.

Nor did it err by finding the cover-up efforts of "others" amounted to "relevant conduct." *See* U.S.S.G. § 1B1.3(a)(1)(B). Pearce argues that his false-records convictions "involved no other participants." But if the actions of others are "within the scope of, in furtherance of, and reasonably foreseeable in connection with jointly undertaken criminal activity," then those actions are relevant conduct that a court can consider at sentencing. *United States v. Donadeo*, 910 F.3d 886, 894 (6th Cir. 2018) (internal quotation marks omitted).

Pauley and Patrick testified about the scope of their agreement with Pearce—they agreed to submit false reports to conceal their assaults on E.G. and C.T. *Cf. id.* ("To ensure that these criteria are met in" each case, courts "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." (quoting U.S.S.G. § 1B1.3 cmt. n.3(B)). Several officers testified that because Pearce pressured them, they submitted false reports to bolster the officers' narrative about the assaults. Therefore, the submission of false reports by other officers was relevant conduct.

**3.**

Pearce argues that the government failed to prove by a preponderance of the evidence that the leadership enhancement applied to Count 3. We disagree.

For Count 3, the district court considered how Pearce pressured Elliott to submit a false report about C.T.'s assault. Again, the district court did not err by finding that Pearce's personal efforts to cover-up his own false reports were relevant conduct. *See* U.S.S.G. § 1B1.3(a)(1)(A).

Nor did the district court clearly err by finding Pearce used his authority to manage Elliott's story. Elliott pleaded guilty to criminal charges in a related case. The government's sentencing memorandum excerpted Elliott's plea agreement, which included Elliott's admission that: (1) Pearce told him to author an untruthful report about C.T.'s assault to corroborate Pearce's own false report; (2) Elliott agreed to write such a report because of "Pearce's seniority and his supervisory role as the operations lieutenant"; (3) Pearce "watched over [Elliott's] shoulder as [he] wrote his false report"; and (4) Pearce further told Elliott "to put that C.T. had left the Lieutenant's Office 'without incident.'" R. 213-1, PageID 2534. Patrick's testimony at trial corroborated Elliott's admissions, as did the testimony given during sentencing by a federal agent who investigated Pearce's case.

Pearce points to a timesheet introduced at sentencing that shows he was not at work on April 30, 2021, the day after C.T.'s assault. He indicates that this would have been the same day that Elliott, in his plea agreement, stated Pearce supervised his report writing and submission. So Pearce essentially argues that the timesheet disproves Elliott's version of events and thus the district court clearly erred.

But Pearce's arguments "speak to credibility issues and factual findings, which we review only for clear error." *United States v. Wellman*, 26 F.4th 339, 355 (6th Cir. 2022) (citation omitted). And it is not clearly erroneous for a district court to credit one version of facts over another when it "identifies two competing permissible versions of the facts and reasonably explains" its decision. *Id.* (citation omitted). The district court here credited Elliott's version of

events over Pearce's. It weighed the timesheet against Elliott's "sworn plea agreement" where he testified "that the facts in his plea agreement were true and correct and could be proven beyond a reasonable doubt" and "the very strong record indicative of [Pearce] micromanaging . . . the Elliott statement." R. 225, Page ID 2761.

This was a reasonable explanation. Pearce's one "piece of proof" was up against Elliott's admissions and Patrick's corroborating testimony. What is more, the report Elliott wrote about C.T.'s assault is dated April 29, 2021. This might further confuse the dates relevant to Elliott's report, but it does not demonstrate any inconsistency in the testimony about Pearce's actions.

**4.**

Pearce further argues that the district court erred in finding that he pressured Ousley and Kelly to write false reports about E.G.'s assault. The record, however, supports the district court's conclusion.

Ousley testified about his call with Pearce following E.G.'s assault. Ousley understood that Pearce wanted him to report that E.G. "was being resistant and aggressive" to corroborate the assaulting officers' "cover story." He also understood that he needed to relay Pearce's directions to Kelly, who was sitting with Ousley when Pearce called. Ousley said he complied because he feared prison staff, including Pearce, would retaliate against him.

Kelly corroborated Ousley's testimony. He testified that he submitted a false report based on his understanding from Ousley's phone call that Pearce wanted to cover up E.G.'s assault. Kelly further testified that he would not have submitted a false report without that phone conversation. Like Ousley, he testified that he submitted his false report for fear of retaliation.

**5.**

Pearce argues that the district court improperly relied on his role as operations lieutenant to find he was a manager or supervisor in the cover-up scheme. This is a "fact-intensive" question that we review deferentially. *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023).

Several factors are relevant to whether Pearce acted as a manager or supervisor. Courts consider whether a defendant "exercised decisionmaking authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice." *Id.* (quotation omitted; emphasis removed). But district courts do not need to find that a defendant did all these things before applying the enhancement. *See id.* (citation omitted).

The record supports the district court's finding that Pearce was a "manager or supervisor" under § 3B1.1. Several witnesses testified during trial that Pearce, as operations lieutenant, had authority over all persons on shift, including Elliott, Ousley, Kelly, and the other correctional officers involved here, and could give orders during a use-of-force incident. Witnesses testified similarly at Pearce's sentencing hearing. The government also offered two audio recordings of Pearce during sentencing. In those recordings, Pearce stated that his operations lieutenant duties included overseeing the correctional officers and the day-to-day activities of the penitentiary and that he was ultimately in charge. As described above, multiple witnesses also testified about how Pearce used this authority to recruit his subordinates to participate in the cover-up scheme by submitting false reports about E.G.'s and C.T.'s assaults.

But at the same time, Pearce did not have authority over "the captain and the warden's office." Pearce argues that this means he acted as a mere "foot soldier" in the assault cover-up

efforts. He contends that his role was limited to "enacting the directives of those above and parallel to him."

The district court understood but disagreed with Pearce's view of the record. It recognized that Big Sandy's executive team "devised and hatched" the cover-up scheme. R. 225, PageID 2760. Still, this did not absolve Pearce of his role because he "used his power and authority" to implement the scheme "through corroborating paperwork from subordinates." *Id.* at 2762–63. So the district court concluded that Pearce acted not as "an organizer or leader" but as a "manager or supervisor." *Id.*

The district court's finding is "plausible on the record as a whole." *See United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022). Pearce's subordinate officers testified consistent with his supervisory role at Big Sandy and about his efforts to recruit them into joining the cover-up scheme. The evidence, including the false reports themselves, demonstrates that Pearce exercised his authority over at least one person and that both of Pearce's convictions involved at least five people. This is sufficient to show that Pearce fell somewhere between a "foot soldier" and the "mastermind behind" the cover-up scheme. *See United States v. Labib*, 38 F. App'x 257, 260 (6th Cir. 2002) (per curiam). In other words, he was a "manager or supervisor." The district court therefore did not clearly err by concluding the same.

**B.**

*Zero-point offender adjustment*. We must next consider the district court's decision to deny Pearce a two-level sentence reduction under U.S.S.G. § 4C1.1. This provision provides for a two-level reduction to a defendant's total offense level if he "did not receive any criminal history points" and meets several other eligibility criteria. U.S.S.C. § 4C1.1(a)(1)–(10). Pearce did not receive any criminal history points and arguably met most of the other zero-point offender-

eligibility criteria. But the district court found that he could not satisfy § 4C1.1(a)(10), which states: "the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848."

The district court found that Pearce could not satisfy subsection (a)(10) because it enhanced his sentence under § 3B1.1. Pearce contends this was in error because subsection (a)(10) requires two things: that he both "received an adjustment under § 3B1.1" and "engaged in a continuing criminal enterprise." Because only one of these two things were true and because he met the remaining criteria in § 4C1.1(a), Pearce argues that the district court should have reduced his offense level by two points.

The government argues Pearce waived this argument by agreeing with the district court's interpretation of § 4C1.1 at sentencing. This argument requires us to consider the doctrines of waiver, invited error, and forfeiture. Our review depends on which doctrine, if any, applies.

The doctrines of waiver, invited error, and forfeiture exist on a spectrum. *See United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021). Waiver is on one end, and it is "the intentional relinquishment or abandonment of a known right." *Id.* (internal quotation marks omitted). We do not review waived claims. *Id.* On the other end of the continuum is forfeiture. It is "the failure to make the timely assertion of a right[.]" *See United States v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014) (quotation omitted). When a defendant fails to "object to a sentencing error," he has forfeited all unpreserved claims and we review under the plain-error standard. *Id.*

Invited error exists somewhere in between waiver and forfeiture. "A litigant invites error when he contributes in some way to the district court's error without intentionally relinquishing his rights." *Montgomery*, 998 F.3d at 698. We do not automatically review invited errors. *See id.* Because a defendant who invites an error "is more responsible for the district court's error than

when he merely forfeits an argument," but is less responsible than when he consciously chooses to waive an argument, "the consequences fall in between those for forfeiture and waiver." *Id.* And so, "we sometimes—albeit rarely—review invited errors to prevent manifest injustice." *United States v. Akridge*, 62 F.4th 258, 263 (6th Cir. 2023) (internal quotation marks omitted).

At sentencing, Pearce's attorney admitted he did not make any arguments under § 4C1.1 in his sentencing memorandum. He then stated that he would like to raise arguments for a zero-point offender adjustment "depending on" how the district court ruled under § 3B1.1. In other words, Pearce's counsel did not think any argument for applying § 4C1.1 was necessary if the district court found a leadership enhancement appropriate under § 3B1.1. The district court and the government agreed. During his final arguments on various Guidelines adjustments, Pearce's counsel reiterated his agreement with the district court's interpretation of § 4C1.1.

Then, the court announced its calculations under the Guidelines. Addressing the two-level zero-point offender reduction, the district court stated: "because I did apply or I did find an aggravating role applicable, that will block the defendant from the true zero benefit . . . under 4C1.1." R. 225, PageID 2769.

After this, the district court heard the parties' arguments about the 18 U.S.C. § 3553(a) factors. To support his argument for a more lenient sentence, Pearce's attorney addressed his client's limited criminal history. Still, he conceded that his client did not qualify for the zero-point offender reduction: "And although the Court said, as it did that, correctly, that because of the aggravating role enhancement, he also loses the two points under" § 4C1.1. *Id.* at 2798.

Considering this, Pearce, through his attorney, agreed in open court with the sentencing judge's interpretation of § 4C1.1. He no doubt did more than passively fail to object to the district court's alleged sentencing error under § 4C1.1. *See Mabee*, 765 F.3d at 671. But we cannot say

that he "made a plain, explicit concession on the record addressing the precise issue later raised on appeal." *Id.* at 673 (explaining that such a concession is necessary to find waiver). Thus, Pearce invited any alleged error related to the district court's interpretation of § 4C1.1.

The question therefore becomes: Do the interests of justice demand we review Pearce's arguments under § 4C1.1 for plain error? *See Montgomery*, 998 F.3d at 699. No. Pearce has not shown that this is the rare case where our review is necessary to prevent manifest injustice. *See Akridge*, 62 F.4th at 263. But even under plain-error review, Pearce's argument would still fail. To succeed under plain-error review, Pearce must show: (1) an error occurred; (2) that was "clear or obvious rather than subject to reasonable dispute"; (3) affected his substantial rights; and (4) affected the "fairness, integrity, or public reputation of judicial proceedings." *Mabee*, 765 F.3d at 673–74 (quotation omitted); *accord Montgomery*, 998 F.3d at 700.

To the extent that there was an error, it was not obvious. Section 4C1.1 went into effect about a month before Pearce filed his sentencing memorandum. About a week after Pearce's filing, the district court sentenced him. So there was little precedent for the district court to rely on when it interpreted § 4C1.1 and certainly none that mandated a ruling in Pearce's favor. *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) ("A lack of binding case law that answers the question presented will also preclude our finding of plain error.").

Our canons of construction also demonstrate how the district court's interpretation of § 4C1.1 was subject to reasonable dispute. "In interpreting the Sentencing Guidelines, the traditional canons of statutory interpretation apply." *United States v. Sands*, 948 F.3d 709, 713 (6th Cir. 2020).

Among other things, to qualify for the zero-point offender adjustment, a defendant must show that he "did not receive an adjustment under § 3B1.1 (Aggravated Role) and was not engaged

in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." U.S.S.G. § 4C1.1(a)(10). Pearce argues that if he can establish that he did not engage in a continuing criminal enterprise, he satisfies § 4C1.1(a)(10). On the other hand, the government argues that Pearce must show both that he did not receive a leadership enhancement and that he did not engage in a continuing criminal enterprise to receive the zero-point offender adjustment. Both interpretations are plausible. *See Pulsifer v. United States*, 601 U.S. 124, 131–133 (2024). And, as such, any error by the district court was not clear or obvious.

## IV.

For these reasons, we **AFFIRM** the district court's judgment.